2002 OK CR 40

**Harold Loyd McELMURRY, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

No. D–2000–884.

Court of Criminal Appeals of Oklahoma.

Dec. 2, 2002.

Thomas Guilioli, District Attorney, Gregory Stidham, Assistant District Attorney, Eufaula, OK, for the state at trial.

James C. Bowen, Okla. Indigent Defense System, Capital Trial Division, Sapulpa, Ok, Richard Lerblance, Hartshorne, OK, for defendant at trial.

Sandra Mulhair Cinnamon, Michael D. Morehead, Okla. Indigent Defense System, Capital Direct Appeals Division, Norman, OK, for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, David M. Brockman, Assistant Attorney General, Oklahoma City, OK, for appellee on appeal.

## OPINION

LILE, Judge.

¶ 1 Harold Loyd McElmurry, was tried by jury before the Honorable Steven W. Taylor, District Judge, and convicted of two counts of First Degree Murder with Malice Aforethought[1] and one count of Robbery with a Dangerous Weapon[2] in McIntosh County District Court Case No. CF–99–154A, and with one count of Larceny of a Motor Vehicle[3] in Case No. CF–99–153B. The jury found four aggravating circumstances as to each murder count and fixed punishment at death on each count. The jury fixed punishment for the robbery at one hundred (100) years imprisonment and for the motor vehicle larceny at twenty (20) years imprisonment. The four statutory aggravating cir-

cumstances[4] found by the jury as to each murder count were:

1. The defendant knowingly created a great risk of death to more than one person;

2. The murder was especially heinous, atrocious, or cruel;

3. The murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and

4. At the present time there exists a probability that the defendant will commit criminal acts of violence that would constitute a continuing threat to society.

¶ 2 The trial court imposed judgment and sentence on June 16, 2000, and set punishment on each charge in accordance with the jury verdicts.[5] The trial court ordered the Twenty (20) Year Sentence in Case No. CF–1999–153A, Larceny of a Motor Vehicle, to run concurrently with the One Hundred (100) Year Sentence in Case No. CF–1999–154A, Count 3, Robbery with a Dangerous Weapon. Appellant has filed his direct appeal in this Court from these judgments and sentences.[6]

## FACTS

¶ 3 Robert and Vivian Pendley lived in a rural area west of Eufaula. Appellant and his wife, Co–Defendant Vickie McElmurry, had previously done yard work for the Pendleys. During the two or three weeks since he had last worked for them, Appellant had been thinking about robbing and murdering them, and had been discussing his plan with Vickie. Robert Pendley was eighty years old, and in a wheelchair. His wife, Vivian Pendley, was seventy-five years old. Appellant believed there was a warrant out for his

---

1. Title 21 O.S.Supp.1998, § 701.7(A).

2. Title 21 O.S.Supp.1999, § 801.

3. Title 21 O.S.Supp.1999, § 1720.

4. Title 21 O.S.1991, § 701.12.

5. Appellant was charged conjointly in these cases with his wife, Vickie McElmurry, except that she was charged with two counts of First Degree Felony Murder rather than First Degree Malice Aforethought Murder. The Defendants' cases were severed for purposes of trial, and Appellant was tried first.

6. Appellant's Petition in Error was filed in this Court December 4, 2000. An evidentiary hearing on trial transcript issues was held in District Court, and District Court Findings of Fact were filed April 20, 2001. Appellant's Brief was filed July 31, 2001, Appellee's Brief was filed October 29, 2001, and Appellant's Reply Brief was filed December 18, 2001. Oral argument was held before this Court August 13, 2002. Appellant's Supplemental Authority after Oral Argument was filed August 23, 2002.

arrest on a probation violation and that he would likely go to prison. He had lost his job, had little money, and could not get a tag for a car he had bought.

¶ 4 He assumed the Pendleys had a lot of money, and he knew they had a car. He said he needed the money and needed something to get on with his life. So he decided to rob, or rob and murder, the Pendleys. On Friday, July 30, 1999, Appellant and his wife began a two-day journey on foot to the Pendley residence. They stopped at Mark's Country Store approximately one mile west of Eufaula on July 30 to buy some groceries. Then they continued on to the Pendleys' through the woods, so they would not be seen.

¶ 5 Upon arriving at the Pendley residence on Sunday afternoon, August 1, the Defendants knocked on the Pendley's door and were invited into their home. The Defendants and the Pendleys moved outside because the Defendants were smoking cigarettes.

¶ 6 After a while, the Appellant and Vickey left the Pendley residence and walked around in a wooded area across the road for one or two hours, trying to decide whether to rob, or to rob and murder, the Pendleys. Appellant says he told his wife, "I wanted to kill them but I didn't feel right about it. I didn't care for Vivian much, but I liked Robert. Robert was always real nice to me."

¶ 7 Appellant did not mention drugs in his statements to police when he was arrested, but when he testified at the preliminary hearing several months later, he claimed that he and his wife each shot-up or injected "a little bit of crank," or methamphetamine, 30 or 40 minutes before returning to the Pendleys' house. Appellant admitted that he knew what he was doing and knew that he was going to rob the Pendley's when he went back over to their house. He said there wasn't any question in his mind about it.

¶ 8 When the Defendants returned to the residence, the Pendleys came out into the garage. Appellant and Robert Pendley remained there while Vivian Pendley and Vickie McElmurry walked out into the backyard.

McElmurry said in his written statement August 6, 1999:

> "Vivian and Vickie were away [from] the house, and I decided to go ahead and kill Robert. Robert and I were in the garage. I had picked up some scissors in the house that I intended to use to kill Robert. All of a sudden I pulled out the scissors and stabbed Robert 6 or 7 times in the chest while he was sitting in his chair. He fell out of the chair and I hit him in the head with a hoe two or three times."

Appellant only stopped when the hoe handle broke. Rows of puncture wounds were also found later on Mr. Pendley's back which were consistent with multiple blows from the metal tines of a garden rake that was found in the garage.

¶ 9 Vivian Pendley walked into view and saw what Appellant was doing to her husband. When Vivian started to run, Appellant yelled to Vickie to hold her until he could get there. He stabbed Vivian repeatedly and then dragged her into the garage, leaving a bloody trail that led up to her body.

¶ 10 Appellant then discovered that Robert was still alive and picked up a three-foot pipe and began hitting him in the head until his skull was shattered. Then, seeing that Vivian was still alive, he beat her with the iron pipe until her skull was also shattered.

¶ 11 The Defendants took seventy dollars, some costume jewelry, the car keys, and two handguns, including a German Lugar pistol, and fled the scene in the Pendleys' Oldsmobile. After spending a day in Houston, Texas, they drove to old Mexico where they stayed two or three days. On August 5, 1999, they crossed the border from Mexico back into the United States near Laredo, Texas. Peter Brewster, a United States Immigration officer, testified that Appellant was driving the Pendleys' car when it crossed the bridge into the United States. Vickie McElmurry was a passenger in the car.

¶ 12 After Appellant was taken into custody, he gave statements to Texas Ranger Doyle Holdridge. Appellant confessed to Holdridge that he murdered the Pendleys, robbed them, and took their car.

¶ 13 The medical examiner, Dr. Donald Distefano, testified that both Vivian Pendley and Robert Pendley died as a result of multiple blunt and sharp force injuries.

¶ 14 Additional facts will be presented where relevant to specific propositions of error.

### VOIR DIRE ISSUES

#### 1. Record of Prospective Jurors' Names

¶ 15 In his first proposition, Appellant claims that his direct appeal counsel and this Court cannot conduct a complete and adequate review of his case because there are several instances where the transcript of *voir dire* does not indicate the names of prospective jurors who were being addressed or who were responding to questions from the judge or counsel. He claims that as a result, his direct appeal counsel is unable to determine whether he received reasonably effective assistance of trial counsel.

¶ 16 Appellant claims that during a portion of the *voir dire* between pages 169 and 235 of the trial transcript several responses of prospective jurors, who cannot now be identified, reflected bias against the defense, that reasonably effective trial counsel should have challenged the prospective jurors who made those remarks, and that his appellate counsel cannot determine whether those prospective jurors were excused by peremptory challenges of either party, or whether they actually sat on the final jury that heard Appellant's case. At no time did trial counsel object to the failure of any party or the judge to address a juror by name. We therefore examine Proposition One for plain error only. *Simpson v. State,* 1994 OK CR 40, ¶ 12, 876 P.2d 690, 695.

¶ 17 Appellant cites Oklahoma cases *Van White v. State,* 1988 OK CR 47, 752 P.2d 814, and *Mooney v. State,* 1999 OK CR 34, 990 P.2d 875, for the proposition that it is the duty of the State in capital cases to provide a complete transcript of trial so that his appellate counsel and this Court will be able to conduct an adequate review of his trial counsel's performance.

¶ 18 We reversed the conviction and death sentence in *Van White* and remanded for a new trial because the court reporter provided *no* transcript of *voir dire,* despite Appellant's having requested the transcription. *Van White,* 1988 OK CR 47, ¶ 14, 752 P.2d at 820.

¶ 19 In *Van White,* in an opinion by Judge Parks, this Court said that "in order to effectuate this Court's mandatory sentence review in capital cases, a complete stenographic record must be taken in all capital proceedings," adopting the position taken by Judge Brett in his specially concurring opinion in *Kelly v. State,* 1984 OK CR 99, 692 P.2d 563, 565–66 (Brett, J., specially concurring). *Van White,* 1988 OK CR 47, ¶ 13, 752 P.2d at 820; 21 O.S.2001, § 701.13(C)(1). We did **not** hold in *Van White* that every failure to provide a complete trial transcript in a death penalty case would be reversible error *per se.* In fact, we found that failure to provide a transcript of the hearing on Van White's application for a competency hearing was not reversible error. *Id.*

¶ 20 Nor have we held in cases since *Van White* that a failure to provide a complete trial transcript in a death penalty case is reversible error *per se,* but have considered the question on a case-by-case basis. In several death penalty cases citing *Van White,* we have applied harmless error analysis and procedural bars in cases with unreported or untranscribed proceedings. See, for example, *Mooney v. State,* 1999 OK CR 34, ¶¶ 19–24, 990 P.2d 875, 884 (Mooney's lawyer asked the judge, who had earlier heard testimony in Mooney's juvenile reverse certification hearing in related robbery case, to incorporate that evidence in the juvenile reverse certification hearing in the murder case. The judge, relying on the evidence presented at the hearing in the robbery case, also refused to certify Mooney as a juvenile in the murder case. No transcript of the original hearing in the robbery case was prepared or included in the appeal record in the murder case. We held that it was Mooney's responsibility to see that the transcript from the robbery case was prepared if he wanted it included in the record in the murder case, but that the issue was moot because Mooney had failed to timely appeal the orders refus-

ing to certify him as a juvenile in either case). Further, in *Mooney,* we found that failure to provide a transcript of a hearing on an Application for Determination of Competency was not reversible error *per se,* where the trial court at a hearing on remand was able to sufficiently reconstruct the substance of the evidence presented at the original hearing. *Id.,* ¶ 21, 990 P.2d at 884. Other cases citing *Van White* include *Black v. State,* 2001 OK CR 5, ¶¶ 83–88, 21 P.3d 1047, 1075–76, and *Allen v. State,* 1994 OK CR 13, ¶¶ 3–15, 871 P.2d 79, 86–89.

¶ 21 We remanded McElmurry's case for a trial court evidentiary hearing, and the trial judge reported in his findings of fact filed in this Court on April 20, 2001, that **the transcript "is a complete record of every word spoken during the trial."** (Emphasis added.) Appellant only cites one case relating to *voir dire* procedure, as distinguished from stenographic transcription procedure. In that case, *United States v. Diez,* 736 F.2d 840, 843–44 (2nd Cir.1984), the Court of Appeals for the Second Circuit said: "**Moreover, any objections to the nature and extent of voir dire not made before the commencement of testimony are treated as waived.** *United States v. De-Fiore,* 720 F.2d 757, 765 (2d Cir.1983)." (Emphasis added.)

■ ¶ 22 In McElmurry's case, an examination of the transcript shows that Appellant did not challenge for cause any of the prospective jurors whose comments are complained of in this proposition. This can be determined because the first comment from an unnamed prospective juror cited by Appellant was at page 169 of the trial transcript, and no prospective jurors were challenged for cause or removed for cause after that point except Prospective Juror Todd who was removed on the court's own motion, without objection, because she said she could not impose the death penalty. Appellant does not claim that the trial court overruled a defense challenge for cause as to any juror.

¶ 23 Appellant conducted his entire *voir dire,* and exercised all nine of his peremptory challenges **after** page 235 of the trial transcript, the last instance where an unattributed comment was made. He had a seating chart which indicated the names of each prospective juror. The trial court required the prospective jurors to return to the same seat after each break until they were excused or *voir dire* was completed. Appellant's trial counsel had a full opportunity to see the prospective jurors face to face, to observe which prospective juror answered each question, to *voir dire* each of them further about the comments, to challenge them for cause, or to use his peremptory challenges to excuse them. We note that all of the jurors who where ultimately seated on the final jury in the case were questioned directly by name and found qualified by the court to try a death penalty case, and each said they could consider all three available punishments: life, life without parole, or death.

¶ 24 Therefore, it appears that Appellant was either satisfied with the jurors in question, or they were among the twenty-one (21) prospective jurors excused after the last unattributed comment. Prospective Juror Todd was excused by the court, and eighteen prospective jurors and two prospective alternate jurors were excused after that point by peremptory challenges taken in chambers on the record at the end of *voir dire.* Having examined all of the unattributed comments in the transcript pages cited by Appellant, we find that none signify plain error in the *voir dire* procedure.

■ ¶ 25 When non-verbal events occur at trial, the normal method of including them in the record is for counsel to move the court to "let the record reflect" the event, describing it for the record. No such request was made by counsel in the cited pages. Appellant should not benefit on appeal from his own decisions made at trial, not to object to the *voir dire* procedure, not to move the court to reflect the prospective jurors' names at each point in the record, whether to further *voir dire* the prospective jurors, or whether to challenge them for cause or by peremptory challenges.

■ ¶ 26 We agree with the statement in the *Diez* case cited by Appellant, *supra,* that **"any objections to the nature and extent of voir dire not made before the commencement of testimony are treated as waived."**

(Emphasis added.) We find no plain error in Proposition One. We will consider Appellant's ineffective assistance of counsel claim relating to *voir dire* procedure below under Proposition Twelve.

¶ 27 Although we find no plain error in the unattributed comments of prospective jurors in this case, we are concerned that failure to identify the source of comments during *voir dire* in some future case might rise to the level of plain error. The risk of this problem occurring is higher when utilizing the juror-struck method because of the larger number of prospective jurors being questioned simultaneously. We do not view this as the court reporter's problem. It is not practical to expect the court reporter to juggle an ever-changing seating chart containing over thirty prospective jurors while accurately taking down every word spoken. Rather, it is a problem which can only be addressed by the diligence of lawyers and the courts. We would implore the trial courts and counsel in the future to ensure that each prospective juror is identified when questioning moves from one juror to the next during *voir dire.*

## 2. Peremptory Challenges in Jury Selection

¶ 28 Appellant claims in his second proposition that the prosecutor used his peremptory challenges to excuse too many "young women." There were no contemporaneous objections to any of the State's peremptory challenges, and therefore we will examine only for plain error.

¶ 29 We will consider the "young" component of his objection first. Appellant alleges:
"The prosecution removed four [women] in their fifties, two women in their forties, a twenty-year old woman, and an eighteen-year old woman. The result was a jury that contained two [women] in their eighties, three in their sixties, one in her late fifties, two in their late forties, and one in her late thirties."

¶ 30 Appellant cites *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), where the United States Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution prohibits discriminatory exercise of peremptory challenges of prospective jurors based on race. There is no claim of racial discrimination in this case.

¶ 31 Appellant cites no case which says the age of a prospective juror cannot be considered by the parties in exercising their peremptory challenges. This Court has clearly held that the age of a prospective juror may be a race-neutral factor in a party's decision to exercise a peremptory challenge. *Patton v. State,* 1998 OK CR 66, ¶ 31, 973 P.2d 270, 285 (prosecutor offered several race-neutral explanations for striking prospective juror from the panel including the fact that "he was the same age as Appellant." We held the reasons given were sufficiently neutral to "pass constitutional muster."), *citing United States v. McMillon,* 14 F.3d 948, 953 (4th Cir.1994) (no racial motivation found behind strike of juror who was the same age as defendant); *Nolte v. State,* 1994 OK CR 81, ¶ 15, 892 P.2d 638, 642 (finding that the State met its burden of proof in establishing race-neutral reasons for excusing a prospective juror, to-wit: "Juror Scott was excused because of the close proximity of her son's age and the defendant.").

¶ 32 We have held in numerous cases that a defendant's constitutional rights are not violated by the operation of 38 O.S.1991, § 28, which allows persons seventy (70) years of age or older to opt out of jury service. (*Pennington v. State,* 1995 OK CR 79, ¶ 31, 913 P.2d 1356, 1365; *Bryson v. State,* 1994 OK CR 32, ¶ 18, 876 P.2d 240, 251, *cert. denied,* 513 U.S. 1090, 115 S.Ct. 752, 130 L.Ed.2d 651 (1995); *Fox v. State,* 1989 OK CR 51, ¶ 10, 779 P.2d 562, 566, *cert. denied,* 494 U.S. 1060, 110 S.Ct. 1538, 108 L.Ed.2d 777 (1990); *Moore v. State,* 1987 OK CR 68, ¶¶ 15–20, 736 P.2d 161, 165, *cert. denied,* 484 U.S. 873, 108 S.Ct. 212, 98 L.Ed.2d 163 (1987)).

¶ 33 We next consider Appellant's complaint that the prosecutor used his peremptory challenges to excuse women in a discriminatory manner. He cites *J.E.B. v. Alabama,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), which prohibits intentional discrimination on the basis of gender in selection of jurors.

¶ 34 In *Batson* the state used peremptory challenges to remove prospective jurors who were members of the same race as the defendant, and in *J.E.B.* the state used peremptory challenges to remove prospective jurors who were of the same gender as the defendant. We said in *Patton*, 1998 OK CR 66, ¶ 30, 973 P.2d at 285:

> "*Batson* establishes a three (3) part analysis: 1) the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race; 2) after the requisite showing has been made, the burden shifts to the prosecutor to articulate a race neutral explanation related to the case for striking the juror in question; and 3) the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination."

¶ 35 Under *J.E.B.* the procedure for objecting to a discriminatory use of peremptory challenges on the basis of gender would be the same as making a *Batson* objection based on race. However, such objections should be made immediately, and certainly before the prospective jurors who are alleged to have been discriminated against are finally excused. Where the defendant, as in this case, chooses not to object to the State's use of a peremptory challenge, the trial court has no opportunity to rule on whether a *prima facie* showing of discrimination could be made and whether a sufficient race-neutral, or gender-neutral, reason for the challenge could be given by the prosecution.

¶ 36 An objection not made at trial, but only on appeal, comes too late to prevent the possibly unjust dismissal of a prospective juror, and the defendant should not be allowed to benefit on appeal from his own intentional choice made at trial. Proposition Two is denied.

### FIRST–STAGE ISSUES

### 3. Defendant's Statements Admitted into Evidence

¶ 37 In Proposition Three, Appellant complains that the prosecutor introduced certain statements by the Appellant admitting he killed the Pendleys and trying to minimize the role his wife Vickie played in the murders. Appellant's argument is that he was lying in those statements to protect his wife, that the prosecutor knew it, and that by using his statements the prosecutor was knowingly and unethically using false evidence against him. There was no objection at trial to the introduction of the defendant's prior statements, and Appellant did not testify at trial or attempt to repudiate his own prior statements. Thus we are left only with appellate counsel's speculation as to which statements were the most accurate. We examine for plain error only. *Simpson v. State*, 1994 OK CR 40, ¶ 12, 876 P.2d 690, 695.

¶ 38 The prosecutor introduced at least five different statements of Appellant. The **first** statement offered against him was the first lie he told to the border patrol when he re-entered the United States from Mexico driving the car he had stolen from the murder victims—he lied by saying that the car he was driving belonged to his grandfather, Robert Pendley. In fact, Mr. Pendley, one of the murder victims, did own the car, but he was **not** Appellant's grandfather. Appellant admitted at the preliminary hearing that he had lied when he said Mr. Pendley was his grandfather.

¶ 39 The **second** statement was an oral confession given by McElmurry to the Texas Rangers. This statement was presented in detail to the jury by the testimony of the interrogating ranger. The **third** statement introduced by the prosecutor against him was a handwritten confession, written by the ranger for McElmurry as McElmurry dictated it, and then signed by McElmurry. The prosecutor specifically introduced testimony by the ranger that this written confession differed from the oral one. These differences were not hidden from the jury, but were specifically emphasized to the jury. McElmurry in this statement tried to minimize his wife's participation in the murders by changing many statements from what "we" did to what "I" did. He admitted that he and his wife had discussed for several days robbing and killing the Pendleys, but claimed that he alone decided at the last moment that he would really kill them. The

fourth of McElmurry's statements was a typewritten version of the handwritten confession. It was typed by the ranger and signed by McElmurry after he had several hours to rest and to reflect on its contents.

¶ 40 The **fifth** statement of Appellant offered against him at trial by the State was his preliminary hearing testimony, read from the transcript, where Appellant had insisted, against his counsel's advice, on testifying for his wife. He again confessed fully to the robbery and murders.

■ ¶ 41 Appellate counsel's theory is apparently that the prosecutor should judge when the defendant is not telling the truth and redact any part of the defendant's confession the prosecutor does not believe. This argument displays a misunderstanding of the role of the parties in our adversarial system. The prosecution is entitled to present statements or admissions made by a defendant, whether they are truthful, untruthful, or self-contradictory. 12 O.S.1991, § 2801(4)(b)(1). Or to put it another way, a defendant is not insulated from the introduction of his own confessions against him merely because they contain known or suspected contradictions or half-truths. The prosecution, by introducing the defendant's own statements against him, does not vouch for the truthfulness of the defendant. Section 2801(4)(b)(1) provides that "A statement is not hearsay if . . . the statement is **offered against a party** and is . . . the party's own statement . . . ." (Emphasis added.)[7]

■ ¶ 42 A statement that is believed to be completely false may be admitted by a party opponent merely because it shows that the defendant has lied about his involvement in the crime. Such a lie, designed to conceal guilt, may on occasion be more convincing evidence of guilt than truthful admissions. Or a statement which is contrary to proven facts may be admitted to demonstrate that the defendant is untrustworthy in other statements. A statement by a defendant intending to deny guilt may incidentally prove his guilt of the crime, or an element of the crime, or his identity, or his presence at the scene of the crime. The United States Supreme Court said in *Miranda v. Arizona*, 384 U.S. 436, 477, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694 (1966):

> "In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication."

It is the duty of the jury to sift through statements to resolve inconsistencies if necessary to determine whether material elements of a crime have been proven beyond a reasonable doubt. Appellant cites no cases supporting his argument that a prosecutor cannot introduce the defendant's statements against him merely because they are contradictory with each other or inconsistent with other proof.

■ ¶ 43 Appellant claims that his trial lawyer should have introduced a transcript of a statement Vickie McElmurry made to the Texas Rangers in which she admitted her full participation in the robbery and murders. Among other things, she admitted in that statement that she handed the scissors to her husband before he began stabbing Mr. Pendley with them. She also claimed that she choked Mrs. Pendley after she ran Mrs. Pendley down and caught her and held her to keep her from escaping. The medical examiner did not find any neck or throat injuries on Vivian Pendley, and choking was not the cause of death. Thus, the physical evidence did not corroborate that part of Vickie's statement. It was just as likely that Vickie McElmurry was exaggerating her own involvement to help her husband as it was the other way around. Appellant does not suggest what exception to the hearsay rule would have allowed trial counsel to have ad-

---

7. Normally a party is prohibited from introducing his own out-of-court declarations. There are limited exceptions, such as 12 O.S.1991, § 2801(4)(a)(2) (previous consistent statement of testifying declarant who is subject to cross-examination may be admitted if it is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive), and 12 O.S.1991, § 2107 (adverse party may require introduction of other writing or recorded statement or other part of writing or recorded statement which should in fairness be considered contemporaneously with already introduced writing or recorded statement).

mitted Vickie McElmurry's statement. It would have been hearsay if admitted in Appellant's trial to prove the truth of the matters asserted in the statement. 12 O.S.1991, § 2801(3).

¶ 44 We find no plain error, and Proposition Three is denied.

### 4. Trustworthiness of Confession

¶ 45 Appellant claims in his fourth proposition that the evidence presented at trial was insufficient to support his confessions and therefore his convictions for first degree malice aforethought murder. We have held that a confession is not admissible under Oklahoma law unless it is supported by substantial independent evidence which would tend to establish its trustworthiness. *Frederick v. State (Frederick II)*, 2001 OK CR 34, ¶ 79, 37 P.3d 908, 931; *Fontenot v. State*, 1994 OK CR 42, ¶ 32, 881 P.2d 69, 80; *Opper v. United States*, 348 U.S. 84, 93, 75 S.Ct. 158, 164, 99 L.Ed. 101 (1954).

 ¶ 46 We said in *Tilley v. State*, 1998 OK CR 43, ¶ 14, 963 P.2d 607, 612 (quoted in *Frederick II* ):

> "However, each material element does not have to be corroborated by facts independent of the confession. [Citation omitted.] In fact, inconsistencies between the facts proven and the facts related in the confession may exist, so long as the inconsistencies do not overwhelm the similarities."

¶ 47 There was no objection to admission of Appellant's confessions at trial on the basis of trustworthiness, so we will examine this Proposition for plain error only. *Simpson v. State*, 1994 OK CR 40, ¶ 12, 876 P.2d 690, 695. We find that there was overwhelming corroboration presented during the trial to establish the trustworthiness of Appellant's confessions. We will list some of that corroboration here, but even more examples exist in the record.

¶ 48 Appellant said they stopped at a grocery on the west edge of Eufaula and bought groceries on July 30, 1999. The charge ticket for food items and cigarettes signed by Vickie McElmurry July 30, 1999, at Mark's Country Store on the west side of Eufaula

was admitted into evidence as State's Exhibit 46.

¶ 49 Appellant said he stabbed both victims with scissors and beat them with a pipe. Agent Iris Dalley of the OSBI found bloody scissors and a bloody pipe at the crime scene. Dr. Distefano said both victims were killed by multiple stab wounds and blows to the head with a heavy blunt instrument.

¶ 50 Appellant said that when he first stabbed Robert Pendley, Mr. Pendley was sitting in his wheelchair and then fell onto the garage floor. His statement was corroborated by Agent Dalley's testimony. Although the folded wheelchair was lying flat on the garage floor when she found it near Mr. Pendley's body, she testified that the vertical blood drip pattern on the chair back indicated that wet blood droplets had run down the back of the chair while it had been standing in an upright position.

¶ 51 Appellant also admitted that he had hit Mr. Pendley several times with a hoe until the handle broke. Agent Dalley found a two-pronged garden hoe in the garage with a broken handle. She found blood on the two prongs and on the broken handle.

¶ 52 Appellant said that after he stabbed Vivian Pendley outside on the yard, he and Vickie dragged her into the garage. The bloody trail leading from the yard up to Mrs. Pendley's body described by witnesses and shown in the crime scene photographs corroborate these details of his confession.

¶ 53 Appellant said they had closed the garage door before they left. Mr. McCullar found the door closed the next day when the Pendley's bodies were discovered. The drag trail under the garage door proves that the door was open when Mrs. Pendley's body was dragged into the garage, corroborating Appellant's claim that he closed the garage door.

¶ 54 Appellant said that when he dragged Vivian's wounded body into the garage in front of Robert Pendley, he realized Robert was still alive. This is corroborated by the physical evidence on the floor of the garage. Agent Dalley observed and photographed a semi-circular swipe pattern in the pool of blood on the floor next to Mr. Pendley's

body, consistent with the length of his arm, indicating that he had been able to move his arm in an arc on the floor as he lay dying.

¶ 55 Appellant said that he then beat Mr. Pendley with a pipe to "finish him off." Agent Dalley observed and photographed medium velocity blood splatters on the floor and on Mrs. Pendley's arm from the direction of Mr. Pendley's body consistent with him having been beaten after Mrs. Pendley's body was dragged into the garage.

¶ 56 Appellant confessed that he had cut the phone line in the Pendley's residence. Agent Dalley testified that the phone line had been cut, and pictures of the cut phone line were admitted into evidence. Here again, the physical evidence confirmed the accuracy of Appellant's confession.

¶ 57 Appellant said he went to the Pendleys' residence to rob them of money and their car, and that he did both. He was captured reentering the United States from Mexico five days after the murders, still driving the Pendley's Oldsmobile. He lied to the border agent by saying it belonged to his grandfather, Robert Pendley. It did belong to the murder victim, Robert Pendley, but he was not related to Appellant. Appellant's possession of the car and the fact that he lied about his relationship to the owner, implying that he had permission to have the car, corroborated (1) his statement that he went to the Pendley's to rob them of their car and (2) his statement that he did steal the car.

¶ 58 Appellant said his wife, Vickey, helped him commit the robbery and murders. Vickie McElmurry was riding with Appellant in the Pendleys' stolen Oldsmobile when the defendants were arrested at the Mexican border, and her blood-splattered purse was found where she had left it at the murder scene with her identification still inside. Her fingerprint and her bloody shoeprints were also identified at the crime scene. The tennis shoes she was still wearing when she was arrested matched the shoeprints at the crime scene. These facts further supported the trustworthiness of Harold McElmurrey's statement.

¶ 59 Appellant, at the preliminary hearing, testified he believed Robert Pendley "yelled" when he stabbed him with the scissors. He also said he believed Vivian Pendley "screamed" when he stabbed her with the scissors. Dr. Distefano's·testimony that the stab wounds in each victim from the pair of scissors would **not** have caused immediate unconsciousness, and that their pain would have caused them to yell or scream, corroborated Appellant's confession.

¶ 60 We find no plain error, and Proposition Four is denied. *Simpson,* 1994 OK CR 40, ¶ 12, 876 P.2d at 695.

### 5. Evidence Claimed to be Prejudicial

#### 5(A). Testimony about Pain

¶ 61 In Proposition Five, Subproposition A, Appellant complains that the medical examiner should not have been allowed to testify in the first stage of trial about any pain that would have been suffered by the victims, Mr. and Mrs. Pendley, in this case. He claims it was irrelevant and that the medical examiner, Dr. Distefano, was not qualified to give an opinion on pain. The basis for his claim that the doctor was not qualified to give an opinion on pain is not apparent. As we said in Proposition Four, the doctor testified that the stab wounds inflicted on each victim would not have caused immediate death but would have caused them to cry out in pain.

¶ 62 Trial counsel did not object at trial either to the relevance of the testimony or to the qualifications of Dr. Distefano to discuss the relationship between the injuries inflicted and pain. We therefore examine this subproposition for plain error only. *Simpson,* 1994 OK CR 40, ¶ 12, 876 P.2d at 695.

¶ 63 This same proposition as to the relevance of pain was raised in *Fairchild v. State,* 1999 OK CR 49, ¶ 66, 998 P.2d 611, 625, *cert. denied,* 532 U.S. 1039, 121 S.Ct. 2002, 149 L.Ed.2d 1004 (2001). We held that pain in a murder case is part of the *res gestae.* We said: "Evidence of the pain suffered by a murder victim and caused by the accused is admissible." *Id.* It is not the duty of the court to anesthetize a crime in order to protect a defendant from the natural consequences of his own intentional acts. The State is permitted to re-create the circumstances known to the witnesses that occurred

simultaneously with the crime and incidental to it as part of the *res gestae* of the crime. These events can be established by both expert and lay witnesses. *Res gestae* are those things, events, and circumstances incidental to and surrounding a larger event that help explain it.

¶ 64 Further, as we said in Proposition Four, the doctor's testimony was relevant to corroborate details of Appellant's confession in his Preliminary Hearing testimony where he stated that one of the victims "hollered" and the other one "screamed." Also, the pain of the victims, the crying out of the victims in response to that pain, and Appellant's continuing nonetheless to assault the victims with various deadly weapons despite their crying out, was relevant to prove Appellant's intent to kill and malice aforethought.

¶ 65 Dr. Distefano also testified that there were defensive wounds on Robert Pendley's hands. Pain, and the fear of pain, are relevant to explain such wounds. The fear of pain was also relevant to prove a material element of the robbery count. Robbery is defined as "a wrongful taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." 21 O.S.1991, § 791.

¶ 66 As to Appellant's unsupported allegation that a medical examiner was not qualified to give an opinion on pain, we note that the medical examiner in this case testified that he first obtained his degree as a Doctor of Osteopathy before he specialized in pathology. After he received his Doctor of Osteopathy degree, he did one year of rotating internship at Hillcrest Hospital in Tulsa where he certainly would have had experience with trauma, injury, and pain in his patients. Afterwards, he began his four years of residency in pathology. Dr. Destefano testified about his credentials, and we find he was competent to describe the pain suffered by the victims in this case.

¶ 67 We find no plain error in this subproposition. *Simpson,* 1994 OK CR 40, ¶ 12, 876 P.2d at 695.

## 5(B). Presence of Victim's Wheelchair in Courtroom

¶ 68 In Subproposition B of Proposition Five, Appellant complains on appeal that he was prejudiced by the presence of certain exhibits in the courtroom before they were admitted, particularly the wheelchair of the victim, Robert Pendley. It appears from the record that these exhibits were brought into the courtroom just before the testimony of the State's third witness, OSBI Agent Iris Dalley, criminalist and crime scene investigator, as there was no mention of their presence in the courtroom before her testimony. During Agent Dalley's testimony, defense counsel objected to exhibits in plain view of the jury before they were admitted. He first mentioned bloody clothing, but when the court inquired if there was anything else, he also mentioned that the wheelchair and the pipe were in plain view of the jury. The court ordered the clothing to be moved to a less conspicuous place. After the clothing was moved, the prosecutor asked defense counsel, "Is that all right, Richard?" There was no response and no further objection.

¶ 69 Shortly after that, a crime scene photograph depicting the wheelchair was admitted into evidence. The wheelchair itself, which had some dried blood spatters and drips on it, was identified by Agent Dalley in her testimony and was admitted into evidence without objection. We find that since the wheelchair was subsequently admitted into evidence, there was no error or prejudice to the defendant in the wheelchair being present in the courtroom during the testimony of the witness who identified it.

¶ 70 We find that there was no error in bringing the exhibits into the courtroom during, or just before, the testimony of the witness who identified them. They were moved to accommodate counsel's request to be as inconspicuous as possible before they were introduced into evidence. Once the exhibits were admitted into evidence, the jurors were entitled to examine them. The cases cited by Appellant do not support his position and are not persuasive. Here, Appellant admits in his brief that the wheelchair was a "relevant exhibit," and does not claim

it was improperly admitted by the court. We find no obvious error in the handling of the exhibits, and no undue prejudice to the Appellant. This subproposition is denied.

### 6. Voluntary Intoxication Defense

¶ 71 Appellant argues in Proposition Six that the trial court should have instructed on the defense of "voluntary intoxication" based solely on Appellant's testimony at the preliminary hearing that before the murder he and his wife had walked across the road from the Pendleys' house and further discussed their intended crimes, and had injected some methamphetamine.

¶ 72 The level of intoxication required to justify voluntary intoxication instructions was defined in *Crawford v. State*, 1992 OK CR 62, ¶ 53, 840 P.2d 627, 638, where we said:

"By statute, voluntary intoxication is not a defense to criminal culpability. 21 O.S. 1981, § 153. However, we recognize an exception to this rule where the accused was so intoxicated that his mental abilities were totally overcome and it therefore became impossible for him to form criminal intent."

We said in *Jackson v. State*, 1998 OK CR 39, ¶ 67, 964 P.2d 875, 892, *cert. denied*, 526 U.S. 1008, 119 S.Ct. 1150, 143 L.Ed.2d 217 (1999): "A defense of voluntary intoxication requires that a defendant, first, be intoxicated and, second, be so utterly intoxicated, that his mental powers are overcome, rendering it impossible for a defendant to form the specific criminal intent ... element of the crime." No evidence was presented indicating that McElmurry, at the time of the murders, was too intoxicated to form a specific intent to kill.

¶ 73 After committing the murder, Appellant was able to drive 400 miles in the victim's car to Houston and was able later to clearly describe the events surrounding the murder. We find in McElmurry's case as we did in *Frederick*, 2001 OK CR 34, ¶ 131, 37 P.3d at 942:

"As there was insufficient evidence of intoxication presented at trial from which a rational jury could find that the defendant was 'so utterly intoxicated' that his mental

powers were totally overcome, rendering it impossible for him to form the specific intent to kill, an instruction on voluntary intoxication was not warranted, and it would have been error to instruct the jury on that defense. *Crawford*, 1992 OK CR 62, ¶ 53, 840 P.2d at 638; *Jackson*, 1998 OK CR 39, ¶ 67, 964 P.2d at 892; *Taylor v. State*, 2000 OK CR 6, ¶ 20, 998 P.2d 1225, 1230, *cert. denied*, 531 U.S. 1157, 121 S.Ct. 1109, 148 L.Ed.2d 978 (2001)."

¶ 74 In fact, Appellant acknowledges the precedent of *Taylor v. State* at another point in his brief, and admits that trial counsel's requests for intoxication instructions were futile in view of *Taylor*.

¶ 75 Appellant's expert witness at trial testified that the body reacts differently to methamphetamine than it does to alcohol, in that methamphetamine does not cause blackouts or loss of memory like alcohol does. Not all illicit drugs have the same effect on the mental processes of the brain that alcohol does. The expert did not present testimony that methamphetamine is capable of completely overcoming the mental powers of a person, rendering it impossible for that person to form the specific intent to kill. Without such evidence in this case, and with evidence that Appellant was able to execute his plan to rob and kill two persons, then to drive that day 400 miles to Houston, Texas, and to be able six days later to relate numerous details of his crime that would be corroborated by physical evidence—the evidence at trial failed to support the intoxication defense. Therefore the trial court did not err in refusing to give an intoxication instruction. *Taylor*, 2000 OK CR 6, ¶ 20, 998 P.2d at 1230.

¶ 76 Proposition Six is denied.

### 7. Double Jeopardy and Title 21, Oklahoma Statutes 1991, § 11

¶ 77 In Proposition Seven, Appellant claims that he cannot be punished for each of the First Degree Murder convictions, the Robbery with a Dangerous Weapon conviction, and the Larceny of a Motor Vehicle conviction under the provisions of 21 O.S. 1991, § 11. Appellant suggests that the rob-

bery conviction should be upheld and that the murder and larceny convictions should be barred.

¶ 78 Also, Appellant claims that either the Robbery with a Dangerous Weapon conviction or the Larceny of a Motor Vehicle conviction is barred by the prohibitions against double jeopardy contained in the Fifth Amendment of the United States Constitution and Article II, § 21, of the Oklahoma Constitution.

¶ 79 The test for double jeopardy was established by the United States Supreme Court in *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). This is known as the same elements test. For a period of time the United States Supreme Court, on a case by case basis, alternated between the *Blockburger* test and the "same conduct" test, also called the "same transaction" test. *Grady v. Corbin,* 495 U.S. 508, 510, 110 S.Ct. 2084, 2087, 109 L.Ed.2d 548 (1990). However they abandoned the same conduct test as unworkable in *United States v. Dixon,* 509 U.S. 688, 704, 113 S.Ct. 2849, 2860 125 L.Ed.2d 556 (1993), and returned exclusively to the *Blockburger* test.

¶ 80 Oklahoma followed *Dixon* in *Mooney v. State,* 1999 OK CR 34, ¶ 17, 990 P.2d 875, 883–84, and we now exclusively apply the *Blockburger* test for double jeopardy. Under the *Blockburger* test, two crimes are **not** the same crime for double jeopardy purposes if **both** crimes require proof of an element not required by the other.

¶ 81 Applying the *Blockburger* test, "Robbery with a Dangerous Weapon" and "Larceny of a Motor Vehicle" are separate crimes for double jeopardy purposes because each crime contains at least one element not contained in the other. Robbery with a Dangerous Weapon requires (1) use of a dangerous weapon, (2) taking must be by force or fear, and (3) property must be taken from the immediate presence of another. 21 O.S. 1991, §§ 791, 801. These three elements are not contained in Larceny of a Motor Vehicle. Two of the elements of Larceny of a Motor Vehicle which must be proven are (1) that the property taken must be an aircraft, auto-

mobile, or other automotive driven vehicle, and (2) that the taker must have an intent to permanently deprive the owner of his property. 21 O.S.Supp.1999, § 1720; *Phillips v. State,* 1958 OK CR 13, ¶ 15, 321 P.2d 724, 726–27. These two elements are not contained in Robbery with a Dangerous Weapon, which does **not** require proof of the intent of the taker to permanently deprive the owner of his property. *Traxler v. State,* 96 Okl. Cr. 231, 251 P.2d 815, 836 (1952). Thus Appellant's double jeopardy argument must fail, and neither Robbery with a Dangerous Weapon, nor Larceny of a Motor Vehicle is barred on double jeopardy grounds.

¶ 82 Appellant's argument that any of his convictions are barred by 21 O.S.1999, § 11, also must fail. None of the crimes were committed by the same "act." The "Robbery with a Dangerous Weapon" and the "First Degree (Malice Aforethought) Murders" are not barred by Section 11. *Mooney,* 1999 OK CR 34, 990 P.2d 875, ¶ 16, 990 P.2d at 883; *Davis v. State,* 1999 OK CR 48, ¶¶ 13–14, 993 P.2d 124, 126–27. Furthermore, neither the "Robbery with a Dangerous Weapon" nor the "Larceny of a Motor Vehicle" is barred by Section 11. *Id.*

## SECOND–STAGE ISSUES

¶ 83 In his eighth, ninth, and tenth propositions, Appellant claims that three of the four aggravators found by the jury to be proven beyond a reasonable doubt in his case are unconstitutional. We have repeatedly rejected these arguments in previous cases. In *Toles v. State,* 1997 OK CR 45, ¶ 58, 947 P.2d 180, *cert. denied,* 524 U.S. 958, 118 S.Ct. 2380, 141 L.Ed.2d 746 (1998), we considered and confirmed the constitutionality of the same four aggravators found in McElmurry's case. We said in *Toles,* "As this challenge is raised in almost every capital appeal, the jurisprudence of this State is very well developed in this area." *Id.,* ¶ 58, 947 P.2d at 192.

### 8(A). Constitutionality of "Continuing Threat" Aggravator

¶ 84 First, in Subproposition 8(A), Appellant claims that the statutory aggravating circumstance that there exists "a proba-

bility that the defendant would commit criminal acts of violence that would constitute a continuing threat to society," 21 O.S.1991, § 701.12(7), is unconstitutional both on its face and as applied. We held in *Toles,* 1997 OK CR 45, ¶ 58, 947 P.2d at 192:

> "The 'continuing threat' aggravator also is neither vague nor overbroad. *Malone* [*v. State* ], [1994 OK CR 43,] 876 P.2d [707] at 715–16; *Snow v. State,* [1994 OK CR 39,] 876 P.2d 291, 298 (Okl.Cr.1994), *cert. denied,* 513 U.S. 1179, 115 S.Ct. 1165, 130 L.Ed.2d 1120 (1995); *Sellers v. State,* [1991 OK CR 41,] 809 P.2d 676, 690 (Okl.Cr.), *cert. denied,* 502 U.S. 912, 112 S.Ct. 310, 116 L.Ed.2d 252 (1991)."

We continue to hold that the continuing threat aggravator is constitutional.

### 8(B). Sufficiency of Evidence for "Continuing Threat" Aggravator

¶ 85 In Subproposition 8(B), Appellant claims that there was insufficient evidence to support the aggravating circumstance that there exists "a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." 21 O.S.1991, § 701.12(7). We said in *Turrentine v. State,* 1998 OK CR 33, ¶ 77, 965 P.2d 955, 977, *cert. denied,* 525 U.S. 1057, 119 S.Ct. 624, 142 L.Ed.2d 562 (1998): "To support the aggravator of continuing threat, the State must present evidence showing the defendant's behavior demonstrated a threat to society and a probability that [the] threat would continue to exist in the future." *See also Hain v. State,* 1996 OK CR 26, 919 P.2d 1130, 1147, *cert. denied,* 519 U.S. 1031, 117 S.Ct. 588, 136 L.Ed.2d 517 (1996).

 ¶ 86 This aggravator can be established by evidence of a prior criminal history, or we may look at the circumstances surrounding the murders of which Appellant was convicted. *Turrentine,* 1998 OK CR 33, ¶ 77, 965 P.2d 955, 977. We also said in *Hain,* 1996 OK CR 26, ¶ 67, 919 P.2d at 1147:

> "[W]e have held that evidence of the callousness of the murder for which the defendant was convicted can be considered as supporting evidence [of the 'continuing threat' aggravator]. *Revilla v. State,* [1994

OK CR 24,] 877 P.2d 1143, 1155–56 (Okl. Cr.1994), *cert. denied* [513] U.S. [1096], 115 S.Ct. 764, 130 L.Ed.2d 661 (1995). In determining the callousness of the crime, the defendant's attitude is critical to the determination of whether the defendant poses a continuing threat to society. *Snow v. State,* [1994 OK CR 39, ¶ 30,] 876 P.2d 291, 298 (Okl.Cr.1994), *cert. denied* [513] U.S. [1179], 115 S.Ct. 1165, 130 L.Ed.2d 1120 (1995). 'A defendant who does not appreciate the gravity of taking another's life is more likely to do so again.' *Id.*"

¶ 87 In McElmurry's prior criminal history, he had been granted a second chance under probation. But when he was unable to cope with that probation, his solution was to plot robbery and murder against weak and elderly persons who had befriended him.

 ¶ 88 In *Turrentine,* 1998 OK CR 33, ¶ 79, 965 P.2d at 978, we said the fact that Turrentine talked of having a shoot-out with the police supported the continuing threat aggravator. This was also true in McElmurry's case. He told Ranger Holdridge: "I kind of started to think of doing something bad to bring everything to [an] end. I thought that I would find a way to make the police have to shoot me."

¶ 89 In *Snow,* we held that the defendant's "immediate subsequent attack" on a second victim, although the second victim survived, supported the "continuing threat" aggravator. *Snow,* 1994 OK CR 39, ¶ 31, 876 P.2d at 298. McElmurry's immediate subsequent attack on Mrs. Pendley likewise demonstrated McElmurry's continuing propensity for violence and disregard for human life.

¶ 90 The callous nature of this crime is reflected in the extensive deliberation and planning that preceded the crime, the deceit used by Appellant in going to the house of the victims and engaging them in conversation as friends before stabbing Robert Pendley in the back, by grabbing and holding Vivian Pendley as she tried to escape after she saw Appellant stab her husband, and by the continued assault on each victim with various weapons not only to make sure they were incapacitated, but to make sure they were dead. Then to make sure the victims

could not report the crime or call for medical help, Appellant cut their phone line.

¶ 91 Appellant told Ranger Holdridge that he had told Vickie before the murders: "I wanted to kill them but I didn't feel right about it. I didn't care for Vivian much, but I liked Robert. Robert was always real nice to me." The callous nature of these killings is demonstrated by his willingness to kill Vivian because he "didn't care for her" and his willingness to kill Robert although he "liked Robert" and admitted that "Robert was always real nice" to him.

¶ 92 Appellant's continuing threat to society is also reflected in his stealing guns from the murder victims and then buying ammunition. He sold the Lugar in Houston to get money, but he kept the .22 pistol. He used the money from the sale of the Lugar, in part, to buy ammunition for the .22, according to a receipt dated August 2, 1999.

¶ 93 We find that there was sufficient evidence presented from which a rational jury could find the existence of the "continuing threat" aggravating circumstance beyond a reasonable doubt. *Abshier v. State*, 2001 OK CR 13, ¶¶ 156–157, 28 P.3d 579, 610, *cert. denied*, 535 U.S. 991, 122 S.Ct. 1548, 152 L.Ed.2d 472 (2002); *Powell v. State*, 1995 OK CR 37, ¶¶ 65, 67, 71, 906 P.2d 765, *Order Granting Rehearing*, ¶ 3, 906 P.2d 765, 781, 782, 784, *cert. denied*, 517 U.S. 1144, 116 S.Ct. 1438, 134 L.Ed.2d 560 (1996); 21 O.S. 1991, § 701.11. In accord, see our recent decision in *Torres v. State*, 2002 OK CR 35, ¶¶ 3–7, 58 P.3d 214. 73 OBJ 3303 (holding existing Oklahoma death penalty procedure requiring jury, unless jury trial is waived, to unanimously find existence of at least one statutory aggravating circumstance beyond a reasonable doubt before a penalty of death may be imposed, is in accord with United States Supreme Court decision in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 2439–40, 2443, 153 L.Ed.2d 556 (2002)).

¶ 94 Proposition Eight is denied.

### 9. "Avoid Arrest or Prosecution" Aggravator

¶ 95 In Proposition Nine, Appellant claims, "As presently applied, the 'avoid arrest or prosecution' aggravating circumstance is unconstitutionally overbroad." We have held repeatedly that the statutory aggravating circumstance that "the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution," 21 O.S.1991, § 701.12(5), is constitutional. We said in *Toles*, 1997 OK CR 45, ¶ 61, 947 P.2d at 192:

> "The aggravating circumstance, 'that the murder was committed to avoid lawful arrest or prosecution' likewise has been found to be neither vague nor overbroad. *Castro v. State*, [1992 OK CR 80, ¶ 44], 844 P.2d 159, 175 (Okl.Cr.1992), *cert. denied*, 510 U.S. 844, 114 S.Ct. 135, 126 L.Ed.2d 98 (1993); *Fox v. State*, [1989 OK CR 51], 779 P.2d 562, 575 (Okl.Cr.1989), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1538, 108 L.Ed.2d 777 (1990)...."

¶ 96 Appellant further claims that the evidence was insufficient to support the "avoid arrest or prosecution" aggravating circumstance, thus rendering his death sentence invalid under the Eighth and Fourteenth Amendments to the United States Constitution as well as Article II, §§ 7 and 9 of the Oklahoma Constitution. We disagree.

¶ 97 In order to establish this aggravator, there must be a predicate crime other than the murder for which the death penalty is sought, for which the defendant seeks to avoid arrest or prosecution. By his own admission, Appellant had pondered for weeks, days, and hours whether he would just rob, or rob and kill, the Pendleys. Under the facts of this case, for each count of murder, the predicate crimes included not only the robbery but also the other murder.

¶ 98 Appellant already intended to kill Vivian Pendley so he could avoid arrest and prosecution for robbing her, but when Vivian saw him stabbing Robert and tried to escape, his additional intent at that point was to kill Vivian so she would not be able to report the murder of her husband, cause Appellant to be arrested, and testify against him.

¶ 99 Then, after Appellant dragged Vivian's wounded body into the garage in front of Robert as she was dying, Appellant says he realized Robert was still alive. He then picked up a pipe and finished killing Robert

with crushing blows to the head. Any rational jury could find that he intended to kill Robert in order to take his property and avoid arrest or prosecution for it. *Abshier,* 2001 OK CR 13, ¶ 157, 28 P.3d at 610.

¶ 100 Any rational jury could also find that McElmurry assaulted Robert Pendley with the pipe so Robert could not survive and testify about the assault on himself, or the robbery, or the murder of his wife Vivian. *Id.*

¶ 101 The facts supporting the "murder to avoid arrest or prosecution" aggravator parallel the facts we listed in support of this aggravator in *Fox,* 1989 OK CR 51, ¶ 61, 779 P.2d at 575–576:

> "The evidence was that he went to the store where he had been formerly employed intending to rob it. He had worked with one of the victims. The codefendants made no attempts to conceal their identities. One of the three victims was resting in an upstairs break room and was brought down to the store's back room where he was killed with the others. The robbery and homicides were executed in the early morning hours when no other customers were in the store or likely to arrive.... The codefendants rinsed their blood splattered clothes before returning to their homes. These factors taken together were sufficient circumstantial evidence that appellant killed with the intent of preventing a lawful arrest or prosecution."

¶ 102 Here, Appellant and his wife went to the Pendleys' secluded country residence, where they had been recently employed by, and were well known to, the Pendleys, with the intent to rob them. They approached on foot, cross-country, through the woods where they were less likely to be seen by witnesses. They chose to rob on Sunday when it was less likely that workers or deliverymen would happen by. The Defendants made no attempt to conceal their identities from their victims. In fact, they visited face to face with their former employers in mock friendship before they commenced to rob them. When Vivian Pendley saw her husband being assaulted and started to run, Appellant could have allowed her to escape as she offered no resistance to the robbery. Instead, Appel-

lant ordered Vickie to capture and hold Vivian until he could kill her also. They killed the only persons who were present. It is reasonable to conclude that he killed her so she could not identify him as the man who robbed her and murdered her husband. Then the McElmurrys dragged Vivian's body into the garage beside her husband. When Appellant realized Robert Pendley was still alive, he grabbed a pipe and continued his murderous assault on him until he had bashed in his skull. Then he perceived that Vivian was still alive and renewed his assault on her until he made sure that she also would not live.

¶ 103 There was sufficient evidence from which a rational jury could find the existence of the "murder to avoid arrest or prosecution" aggravator beyond a reasonable doubt, and this proposition has no merit. *Abshier,* 2001 OK CR 13, ¶ 157, 28 P.3d at 610.

### 10. Great Risk of Death to Two or More Persons

¶ 104 In Proposition Ten, Appellant claims that the statutory aggravating circumstance, "knowingly created a great risk of death to more than one person," 21 O.S.1991, § 701.12(2), as applied, is vague and overbroad. Turning again to *Toles,* 1997 OK CR 45, ¶ 59, 947 P.2d at 192, we said:

> "The 'great risk of death to more than one person' aggravator has been analyzed thoroughly and found to withstand constitutional challenge. *See Malone* [*v. State* ], [1994 OK CR 43,] 876 P.2d [707] at 716 (Okl.Cr.1994); *Trice v. State,* [1993 OK CR 19,] 853 P.2d 203, 220 (Okl.Cr.), *cert. denied,* 510 U.S. 1025, 114 S.Ct. 638, 126 L.Ed.2d 597 (1993)."

This aggravator genuinely narrows the class of murderers eligible for the death penalty because only a small percentage of murderers knowingly place two persons at great risk of death.

¶ 105 Appellant then claims the evidence was insufficient to sustain the aggravating circumstance that he "knowingly created a great risk of death to more than one person." This proposition has no merit. The jury had just convicted Appellant of two

counts of malice aforethought murder beyond a reasonable doubt. Although a person can, without malice aforethought, knowingly create a risk of death to another person, he cannot murder with malice aforethought without having knowingly created a great risk of death. The mental state, "knowingly," is included within the definition of "malice aforethought," and acts which create a risk of death are necessarily included within acts sufficient to cause a murder.

¶ 106 Under the circumstances of this case, where Appellant had actually committed two premeditated murders at once, the proof of the existence of this aggravating circumstance was overwhelming. *See Fluke v. State,* 2000 OK CR 19, ¶ 8, 14 P.3d 565, 568 (where deaths occurred in close proximity in terms of time and location, the killing of more than one person is sufficient to satisfy this aggravating circumstance); *Hooper v. State,* 1997 OK CR 64, ¶ 40, 947 P.2d 1090, 1106, *cert. denied,* 524 U.S. 943, 118 S.Ct. 2353, 141 L.Ed.2d 722 (1998) (Where jury could conclude victims were together when killed, and evidence sufficiently suggested murders were in close proximity, aggravator of great risk of death to two or more persons was supported by the evidence; "Hooper admits this Court has repeatedly held this aggravating circumstance applies where a defendant contemporaneously kills more than one person."); *Ochoa v. State,* 1998 OK CR 41, 963 P.2d 583, 604, *cert. denied,* 526 U.S. 1023, 119 S.Ct. 1263, 143 L.Ed.2d 358 (1999) ("Under our case law, the killing of two people is sufficient to satisfy this aggravating circumstance.").

¶ 107 The murders of the Pendleys, husband and wife, at the same residence, on the same day, with the same lethal instruments, with McElmurry alternating his attacks between the victims until they both were dead, was sufficient proof from which any rational jury could find beyond a reasonable doubt that he knowingly created a great risk of death to more than one person. *Abshier,* 2001 OK CR 13, ¶ 157, 28 P.3d at 610.

¶ 108 Proposition Ten is denied.

## 11. Especially Heinous, Atrocious, or Cruel

¶ 109 Appellant does not challenge the constitutionality of a fourth statutory aggravating circumstance alleged in his case, that the murder was "especially heinous, atrocious, or cruel." 21 O.S.1991, § 701.12(4). But he does claim in Proposition Eleven that the evidence was insufficient to support that aggravator as to Appellant. His argument is not that the evidence would not support the "especially heinous, atrocious, or cruel" aggravator as to his co-defendant who was not on trial, but that we should disregard Appellant's confessions for the reasons stated in his Proposition 3(A) and assume that all the terrible acts of violence committed on the Pendleys were done by Appellant's wife alone. However, we reject this argument and find Appellant's account of his own acts in committing the murders very convincing, consistent with the physical evidence, and well corroborated.

¶ 110 To support a finding that a murder is especially heinous, atrocious, or cruel, the evidence must be sufficient to show the murder was "preceded by torture or serious physical abuse." *Fairchild,* 1999 OK CR 49, ¶ 83, 998 P.2d at 628; *Hawkins v. State,* 1994 OK CR 83, ¶ 42, 891 P.2d 586, 596, *cert. denied,* 516 U.S. 977, 116 S.Ct. 480, 133 L.Ed.2d 408 (1995).

¶ 111 Appellant admitted stabbing both victims several times with the scissors. He said Robert Pendley yelled out, and Vivian Pendley screamed. Vivian was placed in fear, because she saw Appellant stabbing her husband with the scissors and tried to run. She was caught by Vickie McElmurry, at Appellant's request, and held for him until he could get there. He then stabbed Vivian repeatedly with the scissors. The stab wounds would not have caused immediate death or unconsciousness to either victim.

¶ 112 When Appellant dragged Mrs. Pendley's body into the garage he realized that Mr. Pendley was still alive, so he picked up a large pipe and clubbed him with it until he died. He also clubbed Mrs. Pendley with the pipe. Dr. Distefano also testified that Robert had defensive wounds which showed that

he was consciously resisting the attack by putting his hands up and trying to ward off the blows. Both victims were stabbed many times and languished in pain while still conscious.

¶ 113 We find that there was sufficient evidence from which any rational jury could find that the murders of Robert and Vivian Pendley were "preceded by torture or serious physical abuse," and that the "especially heinous, atrocious, or cruel" aggravating circumstance existed beyond a reasonable doubt. *Abshier*, 2001 OK CR 13, ¶ 157, 28 P.3d at 610. Proposition Eleven is denied.

## OTHER ISSUES

### 12. Prosecutorial Misconduct

¶ 114 Appellant claims that prosecutorial misconduct denied him a fair trial in violation of the Fifth and Fourteenth Amendments to the Federal Constitution.

### 12(A).

¶ 115 In his Proposition 12(A), Appellant complains that the prosecution argued facts not in evidence and introduced and utilized improper evidence. We have already dealt with some of these claims in other propositions, and we will not duplicate those comments here.

¶ 116 In Subproposition (12)(A)(3), Appellant's brief states: "The prosecution even attempted to sway the jury during sentencing by stating that Mr. McElmurry's own sister said he expected to get the death penalty." There was no objection to the comment so we examine for plain error only. *Simpson*, 1994 OK CR 40, ¶ 12, 876 P.2d at 695. Appellant's brief ignores the testimony of his sister, defense witness Jennifer Wilson, that Appellant told her in a letter "that he wanted to die, that he would get the death penalty." The prosecutor correctly referred to the defense testimony. There is no plain error in Subproposition (12)(A)(3).

¶ 117 Appellant complains in Subproposition (12)(A)(4) that the prosecution asked during cross-examination of defendant's expert, Dr. Sharp, "Do you agree, doctor, that people should be held accounta-

ble for their actions?" The doctor answered, "**Yes, sir.**" (Emphasis added.) Appellant complains that whether people should be accountable for their actions was an entirely irrelevant question and was asked solely to prejudice Mr. McElmurry. There was no objection to the question at trial, and Appellant cites no authority on appeal in support of this subproposition. *See* Rule 3.5(C)(6), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22 O.S., Ch.18, App. (2001), and cases cited therein. He has therefore forfeited this subproposition on appeal. *Id.*

¶ 118 Even if this issue were not forfeited, and we could consider it, Appellant would still not prevail in his argument. This question asked was in response to a question asked on direct examination of defense witness, Dr. Sharp, by Appellant's own counsel:

"So what do you say, doctor, when someone says, you know, I mean they took the drugs; aren't they responsible for what they do when they're under the influence of the drugs?"

¶ 119 The doctor's response covered nearly one and one-half pages of transcript and never squarely answered the question, but implied that McElmurry was not responsible because he was part of the ten percent of methamphetamine users that had become addicted to it and no longer had a choice.

¶ 120 The prosecutor's question was asking the doctor whether he was implying that chronic methamphetamine users should not be held accountable for their actions. The prosecution is permitted to cross-examine the defense psychologist about his direct testimony. 12 O.S.1991, § 2611(C). We held in *Parker v. State*, 1996 OK CR 19, ¶ 14, 917 P.2d 980, 984:

"Appellant cannot present a witness to testify as to certain facts and then expect the State not to question the same witness further on cross-examination. One who opens up an area of inquiry on direct examination is not then able to complain when that area is pursued further on cross-examination."

The cross examination of Dr. Sharp was effective, as the response was a direct two-word answer—"**Yes, sir**"—that appears to be

the opposite of the answer he gave on direct. (Emphasis added.) The question was not error. We reject Appellant's Subproposition (12)(A)(4).

¶ 121 Appellant complains in Subproposition (12)(A)(5) that the improper questions continued when the prosecutor asked Dr. Sharp if the reason why the victims were killed was because they got in the way. Specifically, in context, the prosecutor asked, "It's unquestioned, doctor, isn't it, that this defendant accomplished his objective that day in respect to the robbery and what he set out to do and what he accomplished? He did everything he set out to do, didn't he, and then more?" The witness answered, "I believe he set out the plan of robbery and he made that, yes, sir."

¶ 122 The prosecutor then asked, "And the victims got in the way and they became a part of that robbery, didn't they?" Counsel objected to this cross-examination, saying, "He's not asking a question, he's **making a statement.**" (Emphasis added.) The court sustained the objection without explanation.

¶ 123 Then the prosecutor said, "Let me rephrase it, doctor. During the commission of the robbery that this defendant did, isn't it true that the Pendleys, the victims of the robbery, were killed because they were the persons that owned the property; they were the victims of the robbery?"

¶ 124 Trial counsel said, **"Again he's giving a statement,** Your Honor. I object to that." (Emphasis added.) The prosecutor responded, "It's a question, Judge." Counsel then asked, "How can he answer that question?"

¶ 125 The court ruled, "The objection is sustained. It's a question, but it's a question the jury is going to decide, not this witness."

¶ 126 Thus, the objection was sustained, albeit on some other ground than the one stated by defense counsel, and the doctor was not allowed to answer. The sustaining by the court of an objection to a question normally cures any error. *Martinez v. State,* 1999 OK CR 33, ¶ 64, 984 P.2d 813, 829, *cert. denied,* 529 U.S. 1102, 120 S.Ct. 1840, 146 L.Ed.2d 782 (2000). This is particularly true where the court's ruling

prevents the question from being answered. Further, a defendant cannot object on one ground at trial, and then argue a different ground on appeal. *Armstrong v. State,* 1991 OK CR 34, ¶ 23, 811 P.2d 593, 599; *Tyler v. State,* 1989 OK CR 31, ¶ 13, 777 P.2d 1352, 1355; *Fitchen v. State,* 1987 OK CR 109, ¶ 13, 738 P.2d 177, 180. Subproposition (12)(A)(5) has no merit.

¶ 127 Appellant complains in Subproposition (12)(A)(6) that the prosecutor embellished the facts during first stage opening. He makes two claims under this subproposition. First, he claims that the prosecutor inflated the number and types of injuries received by the victims, and second, he claims that the prosecutor falsely stated that the phone line **in the garage** was cut.

¶ 128 As to the first claim, Appellant does not specify what is inconsistent between the prosecutor's description of the number and types of injuries received by the victims, and the testimony at trial. He does not quote from, nor even point to, any pages in the transcript where we might find the inconsistencies he alludes to. Therefore, this issue is waived. Rule 3.5(A)(5), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22 O.S., Ch.18, App. (2001). We find it difficult to imagine how it would be possible to exaggerate the injuries received by the victims in this case. The first part of subproposition (12)(A)(6) is denied.

¶ 129 As for the second comment complained of, it simply did not occur. The prosecutor did not say that the phone line was cut **in the garage**—only that the phone line had been cut. Appellant confessed that he had cut the phone line. Agent Dalley testified that the phone line had been cut. Photographs of the cut phone line were admitted into evidence. There was no error in the second part of Subproposition (12)(A)(6).

¶ 130 Appellant complains in Subproposition 12(A)(7) that the prosecution explained to the jury how the probation system worked and how Mr. McElmurry's violation of probation meant that he was going back to the penitentiary. Appellant correctly states that a prosecutor may not argue and infer facts which were not admitted as evi-

dence. *See Young v. State,* 1985 OK CR 18, ¶ 3, 695 P.2d 868, 869. However, Appellant overlooks the record in this case. Appellant had stated in his written confession and in his voluntary testimony at the preliminary hearing, which were both admitted into evidence at trial, that he was in violation of his probation, that his probation was going to be revoked, and that he was going to be sent to the penitentiary. He stated that was why he planned a robbery to get a car and money to go to Mexico. The prosecutor's remarks here were fair comments on the evidence and on Appellant's motive. There were no contemporaneous objections to the remarks; there was no error, and no plain error. *Simpson,* 1994 OK CR 40, ¶ 12, 876 P.2d at 695.

### 12(B).

¶ 131 In subproposition 12(B)(1) Appellant claims the prosecution demeaned Mr. McElmurry before the jury by stating, "[P]oor, old Harold McElmurry ... I guess his dog won't even come up to him." This comment was made in response to counsel's recounting of the run of bad luck that had befallen McElmurry and caused him to rob and brutally murder the elderly couple who had befriended him. The prosecutor should not normally mock defense arguments, but, in context, we find that this comment, which drew no objection, could not have possibly determined the outcome of the trial and therefore did not rise to plain error. *Id.*

¶ 132 Appellant complains in Subproposition 12(B)(2) that the prosecution called Mr. McElmurry's mitigation evidence "excuses," and informed the jury: "They're hoping, they're grasping, ladies and gentlemen, that you will find some reason not to give this two-time convicted murderer justice." There was no objection, and we find no plain error in this comment. *Id.* Appellant had already been convicted of two counts of murder.

¶ 133 McElmurry next complains in Subproposition 12(B)(3) that the prosecution continued by telling the jury, "[L]et's talk about everything else, let's blame everybody else, but don't blame Harold and don't hold him accountable. That's what they want you

to do. They want you to look for a way out. Is that justice, ladies and gentlemen?" There was no objection and no plain error. *Id.* McElmurry claims the prosecutor improperly attempted to destroy Appellant's right to have the jury consider relevant mitigating evidence. However, both sides have the right to argue for or against an alleged aggravating circumstance. *Tuilaepa v. California,* 512 U.S. 967, 977, 114 S.Ct. 2630, 2637, 129 L.Ed.2d 750 (1994). This subproposition has no merit.

### 12(C).

¶ 134 In subproposition 12(C)(1) Appellant claims the prosecutor repeatedly expressed his opinion about justice during the second stage closing arguments. None of these comments were objected to at trial.

¶ 135 In the first comment complained of, Appellant's brief omitted the first half of the sentence. The prosecutor's sentence in full was, "Ladies and gentlemen, on behalf of the State of Oklahoma, **I submit to you** that justice in this case is the death penalty and nothing else." (Emphasis added.)

¶ 136 We have said that the words "I submit to you" are not words of personal opinion, but words that submit the issue to the jury. *Frederick,* 2001 OK CR 34, ¶¶ 154, 162, 37 P.3d at 947, 948–49. We said in another case:

"The word "submit" means to commit to the discretion of others, as when an advocate submits a proposition for approval of the court. See Black's Law Dictionary (1968). The prosecutor was not expressing his personal opinion; he was setting forth his contention that the defendant was guilty as charged which he had every right to do."

*Mills v. State,* 1979 OK CR 22, ¶ 37, 594 P.2d 374, 382, *overruled in part on other grounds by Langham v. State,* 1990 OK CR 9, ¶ 6, 787 P.2d 1279, 1281 (expressly adopting for state as well as federal constitutional claims the "totality of the circumstances" test for sufficiency of search warrant affidavits enunciated by the United States Supreme Court in

*Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), and abandoning the *Aguilar–Spinelli* "two-pronged test" for reliability of search warrant informants).

¶ 137 The next prosecutorial comment complained of was, "You're to determine what justice is, justice for Harold McElmurry, murderer." The comment, in context, reads as follows:

"I guess, ladies and gentlemen, if you want to, and you think that the evidence in this case warrants a lighter sentence, you can do it. You can disregard the evidence. You're the jurors. You're the only people in this county, not us, nobody in this courtroom, nobody in this whole town, has any say in this case but you. You're to determine what justice is, justice for Harold McElmurry, murderer."

Appellant only quoted the last sentence. This comment was not an improper statement of personal opinion, but submitted the question of justice to the jury. *See Mitchell v. State,* 1994 OK CR 70, ¶ 44, 884 P.2d 1186, 1202, *cert. denied,* 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995) ("[C]omments were not phrased in personal terms, but appealed to the jury's understanding of justice and asked that standard be upheld."). The reference to Appellant as "murderer" was not improper since the jury had just found him guilty of two counts of murder.

¶ 138 In the last comment complained of where the prosecutor referred to justice, the prosecutor said: "They want you to look for a way out. Is that justice, ladies and gentlemen?" This statement also deferred to the jury's sense of justice and was not improper closing argument. *Id.* There was no error and no plain error in Subproposition 12(C)(1).

¶ 139 Appellant complains in Subproposition 12(C)(2) that the prosecution also expressed his personal opinion about the case and the evidence: "You know when you try a lot of cases like Mr. Stidham and I do, some cases make you pretty emotional. You look at all the evidence and it's emotional. Some of them make you mad. Some of them, like this one, are even worse." We agree that this line of argument is improper,

but in the absence of an objection, the comments do not rise to the level of plain error. Even if we had found these comments to be plain error, they would be harmless in view of the overwhelming uncontradicted evidence. *Simpson,* 1994 OK CR 40, ¶ 12, 876 P.2d at 695.

¶ 140 In Subproposition 12(C)(3) Appellant complains that the prosecutor also said: "Well, again, maybe we were in different courtrooms, ladies and gentlemen. But the evidence I hear[d] was uncontroverted." This comment in response to argument of trial counsel was not objected to. We find no error.

¶ 141 Appellant complains in Subproposition 12(C)(4) of the prosecutor's further comments. The prosecutor said, responding to remarks of counsel, "If you believe what counsel for defense has told you here in the last few minutes then I probably owe you an apology.... If you believe that, then you have my apologies." There was no objection, and there is no error.

¶ 142 Appellant complains that in Subproposition 12(C)(5) the prosecutor personally vouched for the credibility of State's witness, Iris Dalley: "I've had Iris Dalley on the witness stand a lot of times. And I'm always kind of amazed at what she can tell a jury about a crime scene." There was no objection, so we examine for plain error only. *Id.* Although the qualifications of expert witnesses are relevant, they must be presented by evidence and not by assertions of counsel. Attorneys should not imply that they are personally vouching for the accuracy of an expert witness's testimony. However, the prosecutor did not go that far in this case. *Amaze* is not a word endorsing credibility but is listed in the American Heritage Dictionary, 1971, American Heritage Publishing Co., Inc., at page 1295, as a synonym of *surprise:* "*Amaze* suggests wonder and, often, bewilderment." The prosecutor here was responding to defense counsel criticism of Agent Dalley that she found no physical evidence specifically placing Appellant at the murder scene. The prosecutor's lukewarm statement that he was always "kind of"

amazed at what Agent Dalley could tell a jury about a crime scene, although improperly referring to her success in other cases in general, only served to highlight, albeit inadvertently, defense counsel's point that she found nothing directly connecting Appellant to the crime scene in this case. There was no implication that the witness, or the prosecutor, knew of other evidence connecting Appellant to the crime scene that they could not tell the Jury. There is no reasonable likelihood that the prosecutor's statement here could have affected the outcome of the trial, and we find no plain error. *Simpson,* 1994 OK CR 40, ¶ 12, 876 P.2d at 695.

### 12(D).

¶ 143 Appellant claims in Subproposition 12(D)(1), that the prosecution requested sympathy for the victims from the jury in both stages of trial. He claims that during the first stage the prosecutor argued, "And I would agree Mr. McElmurry's future is in your hands, very much like Mr. and Mrs. Pendley's futures were in Harold McElmurry's hands on August the 1st of 1999. And I hope you'll take that into remembrance." Appellant argues that the statement had no relevance to any issue in the first stage of trial and was an argument for sympathy.

¶ 144 There was no objection to the argument, and we find no plain error. *Id.* The first part of the argument was in agreement with counsel's statement that the defendant's future was in the hands of the jury, and the second part was an accurate comment on the situation on August 1, 1999. We find both the defense and the prosecution statements were within the range of permissible argument.

¶ 145 Appellant complains in 12(D)(2) that during the second stage closing argument the prosecutor argued, referring to the victims, "For being nice they got the death penalty." There was no objection. He also complains further that the prosecutor in the second stage urged the jury to imagine what had occurred to the victims and how they had felt during the attack. The prosecutor asked the jury to imagine what Robert Pendley was seeing and hearing after he was stabbed and was lying on the garage floor,

and to "Imagine the fear in Mrs. Pendley's mind—Imagine the pain. . . ." There was no objection to these comments. In fact, the defense counsel continued with the same theme, "And while you're imagining the last few minutes of the Pendleys' lives, imagine, imagine Harold McElmurry and his entire life." It is not improper to ask the jury to make reasonable inferences from the evidence. Fear and pain are directly related to proof of the "especially heinous, atrocious, and cruel" aggravating circumstance, and are proper subjects for jury consideration and argument of counsel. There is no plain error in these comments. *Id.*

¶ 146 In Subproposition 12(D)(3), Appellant says that defense counsel finally interjected an objection which was sustained by the trial court when the prosecution stated, "I want you to imagine just one more thing for me. I want you to imagine that instead of that being Robert and Vivian Pendley it's you and your husband or wife." The comment was improper, but the error was cured when the court sustained the objection and admonished the jury to disregard it. *Walker v. State,* 1989 OK CR 64, ¶ 13, 781 P.2d 838, 841.

### 12(E).

¶ 147 Appellant complains in Subproposition 12(E)(1) that the prosecution informed the jury during second stage opening statement, "You found the defendant guilty of murdering two people." During closing argument the State reiterated, "You've already decided that Harold McElmurry not only created a risk to two people, he made sure that two people lay dead . . . . You've already decided that one, ladies and gentlemen. You could stop there. But I don't want you to stop there. I want you to go through the rest of the aggravating circumstances."

¶ 148 Appellant claims the prosecution's definition of the aggravator was a misstatement of the law because this aggravator requires more than just the existence of two dead people. Appellant ignores our rulings in *Fluke v. State,* 2000 OK CR 19, ¶ 8, 14 P.3d 565, 568, and *Ochoa v. State,* 1998 OK

CR 41, ¶ 65, 963 P.2d 583, 604, cited in our discussion of Proposition Ten above. There was no error here.

¶ 149 McElmurry complains in Subproposition 12(E)(2) that the prosecutor also stated that "you have to understand that continuing threat means that if they were in a free society, not in prison." There was no objection so we will examine for plain error only. *Simpson,* 1994 OK CR 40, ¶ 12, 876 P.2d at 695. The prosecution was in error regarding the definition of "society." We have held that neither party should attempt to limit the meaning of society to "society within the prison" or "free society" outside the prison. "Society" encompasses society in general, inside and outside the prison. We find that this error does not rise to the level of plain error and could not have affected the verdict. *Id.*

### 12(F).

¶ 150 Appellant complains in Subproposition 12(F) that the prosecution told the jury, "The State of Oklahoma asks you don't ever, ever, ever, give Harold McElmurry the opportunity to do these things again." There was no contemporaneous objection. Appellant claims that this Court has consistently condemned arguments that a defendant on trial for one crime will commit other crimes in the future. Appellant refers to the prosecutor's argument in this case as "societal alarm."

¶ 151 The prohibited "societal alarm" argument is one that mentions crimes committed by other persons and not attributable to the defendant on trial such as arguments that the crime rate is increasing. The "societal alarm" argument is therefore irrelevant to the guilt or punishment of the defendant on trial except that it implies that the jury should "make an example" out of the defendant on trial to deter other potential criminals. Argument about "societal alarm" is substantially more prejudicial than probative, and is therefore prohibited. *See Cooper v. State,* 1978 OK CR 96, ¶ 13, 584 P.2d 234, 238–39.

¶ 152 The prosecutor here did not talk about deterring other persons who may commit crime, or the crime rate, or making an example of this defendant, but only spoke of preventing Appellant from having the opportunity to commit future crimes. We find that the argument here did not constitute "societal alarm," but was the type of argument discussed in *Brewer v. State,* 1982 OK CR 128, ¶ 8 & n. 1, 650 P.2d 54, 58 & n. 1, *cert. denied,* 459 U.S. 1150, 103 S.Ct. 794, 74 L.Ed.2d 999 (1983). Although we said, "It is error to comment on the possibility that a defendant may commit crimes in the future," we added that there is an exception where the probability that the defendant will commit future acts of violence is made relevant by allegations of the Bill of Particulars for the death penalty. *Id.*

¶ 153 Thus, it is not improper to argue in the penalty stage, based on the evidence, that "there exists a probability that the defendant will commit criminal acts of violence that would constitute a continuing threat to society," when that aggravating circumstance has been alleged in the Bill of Particulars. *Id.*

¶ 154 The argument here is relevant to the alleged "continuing threat" aggravating circumstance, and is proper. There is no error, and no plain error, here. *Simpson,* 1994 OK CR 40, ¶ 12, 876 P.2d at 695.

### 13. Ineffective Assistance of Counsel

¶ 155 In his Proposition Thirteen, Appellant complains that he received ineffective assistance of trial counsel in violation of the Sixth Amendment to the United States Constitution and Article II, § 20, of the Oklahoma Constitution. He divides this proposition into three subpropositions: (A) Counsel failed to conduct an adequate *voir dire,* (B) failed to object to inadmissible evidence, and (C) failed to object to instances of prosecutorial misconduct.

¶ 156 We held in *Guance v. State,* 1988 OK CR 39, ¶ 9, 751 P.2d 1074, 1076:

"The standard of review for ineffective assistance of counsel is two-pronged: first, appellant must show that counsel's performance was deficient; second, appellant must show that the deficient performance prejudiced his defense. *Strickland v.*

*Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional conduct, i.e., appellant must overcome the presumption that, under the circumstances, counsel's conduct constituted sound trial strategy. *Id.* at 689, 104 S.Ct. [at] 2065."

### 13(A).

¶ 157 In his Subproposition 13(A)(1), Appellant complains that he received ineffective assistance of counsel because trial counsel failed to conduct an adequate *voir dire* and failed to object to the failure of the judge and prosecutor on several occasions to address prospective jurors by name during *voir dire.* See discussion under Proposition One.

¶ 158 Appellant complains that his direct appeal counsel was unable to determine whether he received reasonably effective assistance of trial counsel during *voir dire* because the trial transcript on several occasions does not indicate which prospective juror was speaking. In his second motion for an evidentiary hearing, Appellant submits affidavits of several Oklahoma Indigent Defense System (OIDS) investigators who interviewed jurors who served on McElmurry's jury and identified several of the jurors who had made the unattributed comments during *voir dire.* However, despite extensive post-trial investigation of jurors and prospective jurors, Appellant has presented no evidence to support his theory that any objectionable juror actually sat on his jury. *Frederick II,* 2001 OK CR 34, ¶ 55, 37 P.3d at 927. *See also Ross v. State,* 1986 OK CR 49, ¶ 11, 717 P.2d 117, 120, and *Ross v. Oklahoma,* 487 U.S. 81, 83–84, 108 S.Ct. 2273, 2276, 101 L.Ed.2d 80, 87 (1988).

¶ 159 In his Proposition 13(A)(2), Appellant complains that counsel failed to object to the prosecutor's systematic use of his peremptory challenges to excuse "young" women from the jury. Appellant relies on the United States Supreme Court case of *J.E.B. v. Alabama,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). See discussion in Proposition Two above. According to Appellant's brief, "young" means "four women in their fifties, two women in their forties, a twenty year old woman, and an eighteen year old woman." We note that *J.E.B.* prohibits discrimination against prospective jurors based on gender, but does not discuss the age of prospective jurors. Appellant's use of the word "young" in his proposition is not based on any authority in *J.E.B.*

¶ 160 The right of both the State and the defendant to use peremptory challenges is an important part of the jury trial system and should not be unduly restricted. We have not extended the right to object to peremptory challenges beyond those circumstances established by the United States Supreme Court. See *Batson v. Kentucky, J.E.B. v. Alabama,* and their progeny. Appellant has cited no case from either this Court or the United States Supreme Court suggesting that the parties may not consider the age of a prospective juror in exercising peremptory challenges.

¶ 161 In his reply brief Appellant admits the difficulty he has in establishing prejudice due to ineffective assistance of counsel in these circumstances. In order to establish that Appellant was prejudiced because the prosecution excused too many women, we would have to assume that (1) there is a stereotypical difference between men and women, (2) that the difference would have favored his client, and (3) that the difference would have changed the outcome of his trial or sentence. In fact, Appellant makes no attempt to show that he was prejudiced by the failure of his trial counsel to raise *J.E.B.* objections to the State's use of its peremptory challenges, and we find no prejudice. This subproposition is denied.

### 13(B).

¶ 162 Appellant complains in his Subproposition 13(B) that his counsel was ineffective for failing to object to the testimony of the medical examiner about "pain," the presence of the victim's wheelchair "throughout the trial," and the introduction of Appellant's confession from the preliminary hearing transcript, as raised in his Propositions Three and Five.

¶ 163 We have determined, in discussing Propositions Three and Five above, that there was no error in the introduction of the evidence complained of, and therefore, further objections by counsel would not have been productive. We find no error in this subproposition.

### 13(C).

¶ 164 Appellant argued in Proposition Twelve that the prosecutor engaged in improper argument and misconduct. In his Subproposition 13(C) he claims that trial counsel was ineffective for failing to object to such prosecutorial misconduct. As we found that there was no reasonable probability that any of the prosecutorial comments that Appellant complains of, even those that were improper, were likely to have changed the outcome of the trial or sentence, any objections to those comments would not have caused a different outcome. Therefore, Appellant does not overcome the strong presumption that his trial counsel was effective. This subproposition is without merit and is denied.

### 13(D).

### Motions for Rule 3.11 Hearing and Notices of Extra– Record Evidence

¶ 165 Appellant filed an "Application for Evidentiary Hearing on Sixth Amendment Claims" on July 26, 2001, the same day his brief in chief was filed. This application for a Rule 3.11 hearing pertains only to his claim that trial counsel was ineffective for failing to admit Vickie McElmurry's written confession at his trial. Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22 O.S., Ch.18, App. (2001). We note that Vickie denied in the statement that she or Appellant had taken any drugs for two days before the murders, while Appellant had testified at the preliminary hearing that they had shot up some methamphetamine thirty minutes before the murders. Thus, introduction of her statement would have contradicted Appellant's attempted intoxication defense and mitigation evidence. See footnote 8 below. Also, her statement clearly reflects a planned conspiracy to kill, which

is contrary to Appellant's defense that although he had contemplated killing the victims, he only finally decided to do so at the last instant. Vickie's confession was also extremely inculpatory of her husband, as when she said she handed the scissors to Appellant who began to stab Mr. Pendley, and when she said Appellant told her to grab and hold Mrs. Pendley until he could get to her. We find that Appellant has failed to make the necessary *prima facie* showing that a Rule 3.11 hearing would be likely to produce evidence that would overcome the strong presumption that his counsel was effective. *Strickland v. Washington*, 466 U.S. at 687, 104 S.Ct. at 2064. Appellant has completely failed to meet his burden to show that he was entitled to an evidentiary hearing on ineffective assistance of trial counsel for failure to introduce Vickie's statement.

¶ 166 Appellant also filed the same day, July 26, 2001, a "Second Notice of Extra–Record Evidence ...." Appellant makes an inadequate showing that additional evidence would demonstrate that trial counsel was ineffective for not objecting to the prosecutor's failure in a few instances to refer to jurors by name or for not objecting to the prosecutor's peremptory challenges of prospective jurors. As discussed above, we have examined the *voir dire* of unidentified jurors and found that the procedure complained of did not result in unqualified jurors sitting on Appellant's jury, and did not affect the verdict. Further, as we discussed above, Appellant cannot show that he was prejudiced by the prosecutor's use of peremptory challenges.

¶ 167 Appellant filed another pleading on July 26, 2001, entitled "Notice of Juror Bias Which was not Revealed During Voir Dire." In effect, this pleading was a notice of extra-record evidence, citing Rule 3.11(A), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22 O.S., Ch.18, App. (2001), pertaining to supplementation of the trial record on appeal. However, Appellant completely ignores Rule 3.11(B), which places strict limitations on the application of Rule 3.11(A). Since Appellant did not file a motion for a new trial, there was no evidence admitted as a part of a motion for a new trial, and since Appellant makes no claim in

this pleading that this extra-record evidence would support a claim of ineffective assistance of counsel "predicated upon an allegation of failure of trial counsel to properly utilize available evidence or adequately investigate to identify evidence which could have been made available during the course of trial," he is prohibited from supplementing the record with matters that were not presented to the trial court. See Rules 3.11(B)(3)(a) and (b), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22 O.S., Ch.18, App. (2001). In the case of alleged juror misconduct, 22 O.S.1991, §§ 952 and 953 require a defendant to file a motion for new trial before formal sentencing, or within thirty days after sentencing for good cause shown with the permission of the trial court. Appellant never filed a motion for a new trial in this case.

¶ 168 An affidavit by an OIDS investigator, attached to the pleading as an exhibit, alleges that one juror admitted to the investigator sometime after the trial that she had knowledge of another murder over ten years before in the State of Washington of the parents of a friend of her son. The investigator also quoted the juror as referring to the victims as "good friends," and saying, "The husband was helpless in a wheelchair, just like the victim Robert Pendley." The juror purportedly refused to sign an affidavit. The investigator does not state when his interview with the juror took place. During *voir dire*, the prosecutor had asked the prospective jurors, including this juror, "Have any of you, your family, or your **close** friends ever been the victims of a crime?" (Emphasis added.) This juror did not reveal any information during *voir dire* about the Washington murders. There is no allegation that this juror brought the Washington murders to the attention of any other juror.

¶ 169 The Evidence Code, 12 O.S. 1991, § 2606(B), provides:

"Upon an inquiry into the validity of a verdict ..., a juror shall not testify ... as to the effect of anything upon his or another juror's mind or emotions as influencing him to assent to or dissent from the verdict ... or concerning his mental processes during deliberations.... An affidavit or

any evidence of any statement by [the juror] concerning a matter about which he would be precluded from testifying shall not be received for these purposes."

Thus, the investigator's affidavit, purporting to quote the juror, cannot be considered for the purpose of impeaching the juror's verdict, and we do not consider it. Appellant's claim is also barred by the application of 22 O.S.1991, §§ 952 and 953, and by Rules 3.11(B)(3)(a) and (b), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22 O.S., Ch.18, App. (2001). Appellant has also waived this issue on appeal by not listing it, together with argument, supported by citation to authorities, statutes, and parts of the record in his brief-in-chief as required by Rule 3.5(A)(5), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22 O.S., Ch.18, App. (2001).

¶ 170 Appellant does not claim that there is any newly discovered evidence or any evidence which could not have been discovered and presented in a timely filed motion for new trial. We find that Appellant's motions for a Rule 3.11 hearing, and to supplement the record with extra-record evidence, should be and are hereby denied.

### 14. Accumulation of Errors

¶ 171 In Proposition Fourteen, McElmurry asserts that an accumulation of errors, even if none is sufficient standing alone to warrant reversal or modification, deprived him of a fair trial. After reviewing all such alleged errors, it is the opinion of this Court that Appellant did in fact receive a fair trial. No errors occurred which singly or in the aggregate would require reversal or modification of this case, and this proposition is denied. *Mollett v. State*, 1997 OK CR 28, ¶ 63, 939 P.2d 1, 15, *cert. denied*, 522 U.S. 1079, 118 S.Ct. 859, 139 L.Ed.2d 758 (1998).

### MANDATORY SENTENCE REVIEW

¶ 172 Pursuant to 21 O.S.1991, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (2) whether the evidence supports the jury's finding of aggravating cir-

cumstances as enumerated in 21 O.S.1991, § 701.12. As noted above, sufficient evidence existed to support all four aggravating circumstances alleged by the State and found by the jury.

¶ 173 The trial court specifically instructed the jury that evidence had been introduced as to eight mitigating circumstances.[8] The trial court also instructed the jury as follows: "In addition, you may decide that other mitigating circumstances exist, and, if so, you should consider those circumstances as well."

 ¶ 174 After carefully weighing the aggravating circumstances and all mitigating evidence, we concur with the jury's determination that the aggravating circumstances outweigh the mitigating evidence and that the sentence of death is factually substantiated and appropriate and not imposed under the influence of passion, prejudice, or any other arbitrary factor. We find that imposition of the death penalty in this case does not violate the United States Constitution's prohibition against "cruel and unusual punishment" nor the Oklahoma Constitution's prohibition against "cruel or unusual punishment." We further find no error which warrants reversal or modification of the sentence of death in either of the two counts of Malice Aforethought Murder in the First Degree.

## DECISION

¶ 175 Harold Loyd McElmurry's Judgments and Sentences of Death in Case No. CF–1999–154A, Counts 1 and 2—First Degree Murder with Malice Aforethought; One Hundred (100) Years Imprisonment in Case No. CF–1999–154A, Count 3—Robbery with a Dangerous Weapon; and Twenty (20) Years Imprisonment in Case No. CF–1999–153A, Larceny of a Motor Vehicle, with the Twenty (20) Year sentence running concur-

rently with the One Hundred (100) Year sentence, are hereby **AFFIRMED.**

LUMPKIN, P.J., concurs.

JOHNSON, V.P.J., concurs.

CHAPEL, J., concurs in results.

STRUBHAR, J., concurs.

---

8. "1. The defendant did not have any significant history of prior criminal activity.
2. The defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired by methamphetamine.
3. The defendant was under the influence of emotional disturbance by virtue of his chemical dependency on methamphetamine.
4. The defendant acted under circumstances which tended to reduce the crime in that he was under the influence of methamphetamine.
5. The defendant is likely to be rehabilitated.
6. Cooperation by the defendant with authorities.
7. The defendant's age.
8. The defendant's emotional/family history."