2004 OK CR 29

**Victor Cornell MILLER, Appellant**

v.

**The STATE of Oklahoma, Appellee.**

No. D 2002–782.

Court of Criminal Appeals of Oklahoma.

Sept. 17, 2004.

Steven Sewell, William J. Musseman, Jr., Marny Kawano, Asst. District Attorneys, Tulsa, OK, Attorneys for State at trial.

Pete Silva, Public Defender, Sid Conway, Asst. Public Defender, Tulsa, OK, Attorneys for Defendant at trial.

Stephen Greubel, Asst. Public Defender, Tulsa, OK, Attorney for Appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, David Brockman, Assistant Attorney General, Oklahoma City, OK, Attorneys for State on appeal.

## OPINION

JOHNSON, Presiding Judge:

¶1 Appellant, Victor Cornell Miller, was tried by a jury and convicted of two counts of First Degree Murder (Counts 1 and 2), by malice aforethought, or alternatively, felony/murder, in violation of 21 O.S.1991, § 701.7(A) and (B), in the District Court of Tulsa County, Case No. CF 1999-4583.[1] On

---

1. Appellant Miller was charged jointly with John Hanson. Appellant's Motion for Severance was granted, and Defendant Hanson's case was tried before Appellant's case. Hanson was convicted of malice murder in Count 1 and felony murder in Count 2. Hanson's jury imposed a death sentence on Count 1 and life without the possibility of parole on Count 2. We affirmed Hanson's convictions, but due to pervasive error in jury selection and second stage errors, we reversed Hanson's death sentence and remanded Count 1

both Counts, the jury found the existence of four aggravating circumstances: (1) the defendant was previously convicted of a felony involving the use or threat of violence;[2] (2) the defendant knowingly created a great risk of death to more than one person;[3] (3) the murder was committed for the purpose of avoiding or preventing lawful arrest or prosecution;[4] and (4) the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.[5] The jury recommended life imprisonment without the possibility of parole on Count 1 and imposed a death sentence on Count 2. Appellant was sentenced in accordance with the jury's verdicts on June 17, 2002.[6]

¶2 Mary Bowles was abducted from the Promenade Mall in Tulsa, Oklahoma, sometime between 4:15 p.m. and 5:50 p.m. on August 31, 1999. She drove a tan Buick LeSabre. Her body was found on September 8, 1999, in a secluded area near the 9000 block of North 66th Street in Tulsa County. Her car was found on September 9, 1999, in the parking lot of the Oasis Motel in Tulsa. Bowles died from multiple gunshot wounds.

¶3 Around 5:50 p.m. on August 31, 1999, Jerald Thurman called his nephew Jim Moseby from a dirt pit he operated near the 6800 block of North Mingo. Thurman told Moseby he had seen a car inside the pit area and was going to lock the gate to the pit if the car was not gone by the time he finished dumping his load. Moseby drove to the dirt pit, saw his uncle's dump truck outside the gate, and discovered Thurman lying on the ground nearby. Thurman had been shot several times. He died two weeks later.

¶4 Sundeep Patel, owner of the Oasis Motel, saw the co-defendant John Hanson on August 31, 1999, sometime between 6:00 and 6:30 p.m. Hanson asked to borrow some tools because his car would not start. From his office window, Patel saw Hanson and another man working on a champagne-colored Buick LeSabre in the motel parking lot. Patel described the other man as 6′2″ or taller and said he weighed around 240 pounds. Hanson rented a motel room and provided Patel with identification when he filled out the motel registration card. At trial, Patel was not asked to identify and did not identify Appellant as the other man whom he saw with Hanson.

¶5 On September 7, 1999, Brandi Wilson was robbed by two men while working at Signature Loan Service. On September 8, 1999, Bobbie Filak was robbed by two men while working at the Tulsa Federal Employees Credit Union. Both women identified Appellant as one of the men who robbed them.

¶6 Appellant's wife Phyllis Miller said she and Appellant lived at a Motel 6 from late August until September 9, 1999. Co-defendant John Hanson was her husband's friend and lived with them briefly before August 1999. Phyllis said Hanson always carried a paper bag with a nine millimeter gun in it. She had also seen Appellant with a silver revolver that he had taken during the robbery of the Apache Liquor Store on August 23, 1999.[7] Phyllis drove Appellant and Hanson when they committed robberies. Phyllis testified she argued with Appellant on August 31, 1999, when he wanted to use the car for another robbery; then he disabled the car. Appellant and Hanson left after the argument, around 3:00 p.m., and did not return until after midnight.

---

for resentencing. *Hanson v. State,* 2003 OK CR 12, ¶ 1, 72 P.3d 40.

2. 21 O.S.Supp.1999, § 701.12(1).

3. 21 O.S.Supp.1999, § 701.12(2).

4. 21 O.S.Supp.1999, § 701.12(5).

5. 21 O.S.Supp.1999, § 701.12(7).

6. Appellant's Petition in Error was filed October 10, 2002. Appellant's *Pro Se* Supplemental Brief was filed November 6, 2003. Appellant's Brief in Chief was filed September 12, 2003. Appellee's Answer Brief and Response to *Pro Se* Supplemental Brief were filed October 2, 2003. Appellant's Reply Brief was filed December 19, 2003. This matter was submitted to this Court on October 9, 2003. Oral Argument was held on February 24, 2004. The State filed Supplemental Authorities on March 9, 2004.

7. Appellant robbed the Apache Liquor Store on August 23, 1999, and took the gun from its owner.

¶ 7 The next morning, Appellant "put the wires back" on her car and asked Phyllis to take him and Hanson to the Oasis Motel. At the motel, she saw Appellant get into the driver's side of a beige car carrying a blue towel; he moved around some and got out with the towel and some cassette tapes. When they left, Appellant threw the cassette tapes out of the car window. She drove Appellant and Hanson to North 54th Street and Hartford, where Hanson got out and walked to a car by the side of a house.

¶ 8 When Phyllis drove Appellant and Hanson to commit a robbery in September 1999, both men had guns.[8] When they returned to the car after the robbery, the envelope Hanson carried exploded with dye. Appellant told Phyllis to drive to Muskogee. There, she and Appellant had another argument about the car and Appellant again disabled the car. Phyllis had the car towed back to Tulsa. When she got back around 2:00 a.m. on September 9, 1999, Phyllis phoned the police and told them Hanson and Miller had robbed the credit union and were at the Muskogee Econolodge Motel.

¶ 9 An officer investigating Bowles' disappearance and the discovery of her vehicle overheard the police dispatch about the credit union robbery and recognized Hanson's name. Law enforcement officers from various jurisdictions coordinated this information and served warrants on Appellant and Hanson at Room 135 of the Econolodge Motel in Muskogee, Oklahoma. Appellant came out of the motel room almost immediately, but Hanson remained inside the motel room for several hours until he was driven out by tear gas.

¶ 10 Officers found Six Hundred Fifty-Five dollars ($655.00) of red dye-stained money in Appellant's shoes. In the motel room, officers found a Taurus Model 85 .38 caliber silver revolver and a Star Firestar 9 millimeter semi-automatic pistol, duct tape, plastic sacks, gloves, envelopes, ammunition and other items associated with the robberies.

¶ 11 A forensic firearms examiner examined two projectiles recovered from Jerald Thurman's body during autopsy and said they were fired from the Taurus Model 85 .38 caliber revolver. A projectile recovered from Bowles' body and two 9 millimeter bullet casings found at the scene were fired from the Star Firestar 9 millimeter.

¶ 12 A fingerprint examiner matched a single fingerprint found in Bowles' car on the driver's side seat belt to Hanson's known prints. One print found on the passenger's side seat belt matched Appellant's right thumb print.

¶ 13 Prior to trial, Appellant's motion to sever his trial from Hanson's, based on Hanson's confession and antagonistic defenses, was granted. At trial, over strenuous and repeated objections, the State called Rashad Barnes, and Barnes was allowed to testify to Hanson's confession.

¶ 14 Rashad Barnes[9] said Hanson lived in an old car parked in his parents' back yard. Barnes said sometime in early September 1999, around 3:30 or 4:00 p.m., Hanson walked up to him acting nervously and said, "It went all bad." Barnes was allowed to tell the jury a number of things Hanson allegedly told him. He said Hanson said "he had to kill somebody." Hanson told Barnes he and Victor Miller went to the Promenade Mall to carjack someone. They saw an old woman, carjacked her and put her on the floor in the back seat of her car. Hanson rode in the back seat her while Victor Miller drove. Hanson told Barnes Appellant drove them to a back road and when Hanson tried to put the old woman out of the car, someone saw them and Hanson put her back in the car. Appellant said he "was going to handle it." Hanson said Appellant "got out of the car and shot the man" and "Vic got back to the car, told him he knew what he had to do. He said he shot the old lady and pulled her out and put bushes on her." Hanson told Barnes Appellant reloaded his gun when he got back into the car. "They drove the car to a hotel, and he wiped his prints out of the car and caught a ride out north."

---

8. Phyllis Miller was never charged as an aider and abettor to the robberies.

9. Rashad Barnes is also known as "Ali" Barnes.

¶ 15 Barnes admitted he only came forward with this evidence after he was subpoenaed to testify before a federal grand jury. Barnes could not remember the date Hanson told him about the carjacking and murders; he admitted he never told the grand jury Hanson lived in Barnes' car, never told them Hanson said Appellant shot and killed a man, and never told the grand jury Hanson said anything about wiping out a car or covering Bowles' body with bushes. Before he told anyone, Barnes admitted he heard twice on the street that his "homey" [Hanson] had killed somebody. Barnes gave a statement to Detective Nance on December 9, 1999, but said he did not remember telling Nance how many times Appellant shot the man (seven times); he did not recall telling Nance that Hanson said Appellant was reloading his gun when he got back into the car. Barnes did not remember telling Hanson to leave after their conversation. Barnes admitted telling Nance Hanson was telling everybody about the killing.

¶ 16 At trial, Barnes testified the conversation with Hanson happened between 3:00 and 4:00 in the afternoon and lasted fifteen to twenty minutes, but he admitted he previously testified the conversation lasted seven or eight minutes. At Hanson's trial, he testified it lasted thirty to forty-five minutes. Barnes could not recall what day Hanson told him these things, but he thought it was a Tuesday because a couple of days later, "he saw them on TV." Barnes did not remember where he was on August 31, 1999.[10]

¶ 17 Appellant testified and admitted he was convicted in 1981 of three counts of armed robbery. He also admitted he was recently found guilty of sixteen counts of felony crimes associated with a string of robberies he and Hanson committed. His sentences for those sixteen federal crimes total life imprisonment plus 157 years.

¶ 18 Appellant said he argued with Phyllis in the Motel 6 parking lot "two days" before his arrest (September 7) around 1:00 p.m. When a man overheard them and threatened to call the police, Appellant said he pulled the spark plug wires in their car, because he wanted to make sure Phyllis did not leave. He said he left with Hanson and they went to Barnes' house,[11] but Barnes was not there. Appellant left Hanson there. About sundown, Appellant returned to the motel to talk to Phyllis. He said he did not have a firearm, because Hanson and Barnes kept the weapons at Barnes' house. They picked up Hanson and the weapons when they were "ready to do" a robbery.

¶ 19 Appellant testified Hanson called him the next day between 8:00 and 9:00 a.m. Appellant and Phyllis drove to Barnes' house and saw Barnes talking with Hanson. Hanson gave Appellant some keys and Appellant and Phyllis drove to the Oasis Motel. Appellant found Bowles' car. The car would not start so Appellant looked for a kill switch. Appellant went to check the Buick LeSabre "because I was doing something for my friends and getting paid for it." Appellant said he knew the car did not belong to Hanson or to Barnes, and he took the rag to wipe the car down to make sure he did not leave prints. Appellant removed some cassette tapes from the car and threw them out as they drove away. He drove back to Barnes' house and gave Hanson the keys, then returned to the Motel 6 with Phyllis. Appellant said he always used his own car in the robberies and his car was running on August 31, 1999. Appellant could not say what he was doing on August 31, 1999, but he denied killing Thurman or participating in the carjacking and murder of Bowles. Appellant admitted he robbed the Apache Liquor Store in August 1999 with Phyllis and Hanson; Hanson took the silver revolver during the robbery. Appellant said the other gun came from Rashad [Barnes] and that Rashad [Barnes] kept the guns.

10. August 31, 1999 fell on a Tuesday. Appellant and Hanson were arrested on September 9, 1999, which was a Thursday. If Barnes testified truthfully and correctly as to when the conversation with Hanson occurred, it likely occurred a full week after Bowles' abduction—on the Tuesday "a couple of days" before he saw them on television (the date of their arrest on September 9, 1999).

11. Appellant said Hanson introduced him to Rashad Barnes and that he had been to Barnes' place several times.

¶ 20 Alton White and Gregory Malone, both incarcerated in the Tulsa County jail at the time of Appellant's trial, each testified that Hanson talked to them about Appellant's murder charges. Hanson told White he was upset the person who helped him commit these murders was not in jail. Hanson told White Barnes took "hisself (sic) out of the place of the murder and put Mr. Miller in it." White testified Barnes committed the murders with Hanson and then said Victor Miller did what he [Barnes] did. About a week and a half later, Hanson told White he and Ali [Barnes] hijacked a car from an old lady, drove her to a back road to let her out, someone saw them, and Ali [Barnes] got out of the car and shot him. Then Hanson killed the old woman. Hanson told White they left the car in a parking lot and could not get it started; he said Hanson asked his friend "Vic" to work on the car. White admitted the State of Oklahoma was seeking the death penalty against him on murder charges, but denied having any reason to lie.

¶ 21 Gregory Malone talked to Hanson in February 2000. Malone said Hanson said they [he and Barnes] had committed crimes and was mad at Miller's wife for telling on them, so put "Vic" in the picture and took Ali Barnes out of it.

¶ 22 Other relevant facts will be discussed as necessary.

¶ 23 In Proposition One, Appellant argued the trial court's decision to allow Rashad Barnes to tell the jury what Hanson said to Barnes denied Appellant of his Fifth, Sixth, and Fourteenth Amendment rights and we agree.[12]

¶ 24 In criminal prosecutions, state and federal, an accused has a right "to be confronted with the witnesses against him." *See* U.S. Const. Amends. VI and XIV; Okla. Const. Art. 2, § 20; *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The chief concern of the Confrontation Clause "is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig,* 497 U.S. 836, 845, 110 S.Ct. 3157, 3163, 111 L.Ed.2d 666 (1990). The Confrontation Clause "bars admission of some evidence which would otherwise be admissible under an exception to the hearsay rule." *Idaho v. Wright,* 497 U.S. 805, 814, 110 S.Ct. 3139, 3146, 111 L.Ed.2d 638 (1990) (citations omitted).

¶ 25 Traditionally, for purposes of the confrontation clause, all hearsay statements were admissible if (1) the declarant was unavailable to testify, and (2) the statement bore "adequate indicia of reliability." *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). However, the United States Supreme Court recently overruled *Roberts* to the extent that it applies to "testimonial" hearsay. *See Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 1369–1374, 158 L.Ed.2d 177 (2004). In *Crawford,* the Court concluded that the "adequate indicia of reliability" standard set forth in the second prong of the *Roberts* test is too amorphous to adequately prevent the improper admission of "core testimonial statements that the Confrontation Clause plainly meant to exclude." *Id.,* 541 U.S. at ——, 124 S.Ct. at 1371. The Court held that testimonial hearsay statements may be admitted as evidence against an accused at a criminal trial only when the declarant is unavailable to testify and the defendant has had a prior opportunity to cross-examine the declarant. *Id.,* 541 U.S. at ——, 124 S.Ct. at 1374.

¶ 26 In *Crawford,* the Court drew a distinction between testimonial hearsay and non-testimonial hearsay, and noted that non-testimonial hearsay might still be admissible against an accused in a criminal trial if both prongs of *Roberts* were satisfied, regardless of whether the defendant had a prior opportunity to cross-examine the declarant. *Id.* Although the Court declined to define the terms "testimonial" and "nontestimonial," the Court discussed three types of "testimonial"

---

12. Prior to trial, the State filed a Motion in Limine Regarding Admission of Hanson and Appellant filed a response. Hearing on the motion was held on October 29, 2001, and Judge Morrissey ruled Rashad Barnes could testify to Hanson's statements at trial. Defense counsel imposed timely objections at trial to the admission of Barnes' testimony and this issue is preserved for review.

statements: ex parte in-court testimony, extrajudicial statements contained in formalized testimonial materials, and statements made under circumstances which would lead an objective witness to reasonably believe that such statement would be available for use at a later trial. *Id.,* 541 U.S. at ——, 124 S.Ct. at 1364. "Whatever else the term [testimonial] covers, it applies *at a minimum* to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.,* 541 U.S. at ——, 124 S.Ct. at 1374 (emphasis added).

¶ 27 The statement at issue in this case is nontestimonial. It was not admitted through affidavit, a formalized deposition and was not a confession resulting from a custodial interrogation. Accordingly, we read *Crawford* to allow the admission of such a nontestimonial statement over the defendant's right of confrontation if the hearsay is inherently trustworthy and reliable.

■ ¶ 28 Reliability can be inferred in a case where the evidence falls within a firmly rooted hearsay exception; in other cases, the evidence must be excluded absent a showing of particularized guarantees of trustworthiness. *Ohio v. Roberts,* 448 U.S. at 65–66, 100 S.Ct. at 2538. While we continue to apply this test to nontestimonial hearsay, we keep in mind that the Supreme Court certainly recognized in *Crawford* the inherent problem with courts replacing constitutional guarantees with subjective balancing tests and making reliability determinations—"whether a statement is deemed reliable depends heavily on which factors the judge considers and how much weight he accords each of them." *Crawford,* 541 U.S. at ——, 124 S.Ct. at 1371. One court might attach significance to a fact another court would not. *Id.*

¶ 29 In addition to *Crawford,* we consider the Supreme Court's relatively recent ruling in *Lilly v. Virginia,* 527 U.S. 116, 134, 119 S.Ct. 1887, 1899, 144 L.Ed.2d 117 (1999) to be controlling. There, the Supreme Court examined a similar case where the State of Virginia introduced the confession of a non-testifying codefendant which implicated the defendant on trial. The non-testifying codefendant's statements to the police were admitted against the defendant under the "statements against penal interest" exception to the hearsay rule. The Supreme Court of Virginia found the defendant's right of confrontation was not violated because the statements fell within a firmly rooted exception to the hearsay rule and because the statements were reliable; the Virginia court noted the declarant also implicated himself and the statements were independently corroborated at trial. *Id.,* 527 U.S. at 122, 119 S.Ct. at 1893.

¶ 30 The United States Supreme Court disagreed and held that "accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence." *Id.,* 527 U.S. at 134, 119 S.Ct. at 1899. The Court observed this particular type of hearsay [a statement against penal interest offered by the prosecution to establish the guilt of an alleged accomplice of the declarant] "encompasses statements that are inherently unreliable." *Id.,* 527 U.S. at 131, 119 S.Ct. at 1897.

■ ¶ 31 The Supreme Court examined Virginia's application of the residual trustworthiness test *de novo* and found admission of the non-testifying co-defendant's confession violated Lilly's right of confrontation. "[W]hen deciding whether the admission of a declarant's out-of-court statements violates the Confrontation Clause, courts should independently review whether the government's proffered guarantees of trustworthiness satisfy the demands of the clause." *Id.,* 527 U.S. at 137, 119 S.Ct. at 1900.[13] The Supreme Court reiterated that it has rejected the notion that separate evidence corroborating a hearsay statement may properly support a finding that the statement bears particularized guarantees of trustworthiness.

---

13. Under *Crawford,* the hearsay at issue in *Lilly* clearly would be inadmissible not just for the reasons the Supreme Court found in *Lilly.* It was "testimonial" as it was a confession given to police under circumstances which would lead an objective witness to reasonably believe that such statement would be available for use at a later trial. It was the type of testimony which clearly implicated the confrontation concerns discussed in *Crawford.*

"To be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of *its inherent trustworthiness, not by reference to other evidence at trial." Id.,* 527 U.S. at 138, 119 S.Ct. at 1901, *quoting Idaho v. Wright,* 497 U.S. at 822, 110 S.Ct. at 3150 (emphasis added).

¶ 32 In *Wright,* the Court noted certain factors which state and federal courts had identified which "properly relate to whether hearsay statements made by a child witness in child sexual abuse cases are reliable." *Id.,* 497 U.S. at 821, 110 S.Ct. at 3150. These factors include but are not limited to spontaneity and consistent repetition, mental state of the declarant, use of terminology unexpected of a child of similar age, and lack of motive to fabricate. *Id.*

■ ¶ 33 In this case, the State urges this Court to find Hanson's statements to Barnes were admissible under a "firmly rooted exception" to the hearsay rule. Although it could be more clearly stated in the record before us, the State argues the "against penal interest" exception to the hearsay rule constitutes a proper basis for admission of the evidence.

¶ 34 Title 12, Section 2804(B) provides certain evidence is not excluded under the hearsay rule if the declarant is unavailable as a witness. These exceptions include "[a] statement which was at the time of its making contrary to the declarant's pecuniary or proprietary interest, or which tended to subject him to civil or criminal liability ... and which a reasonable man in his position would not have made unless he believed it to be true." [14] 12 O.S.2001, § 2804(B)(3). Subsection 5, the "residual exception" to the hearsay rule, provides that a statement not specifically covered by any of the "foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness," may be admitted if the court determines the statement is offered as evidence of a material fact,

the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts, and the general purposes of this Code [the Evidence Code] and the interests of justice will best be served by admission of the statement into evidence. 12 O.S.2001, § 2804(B)(5).

¶ 35 Neither of these exceptions are "firmly rooted" hearsay exceptions. *See Lilly,* 527 U.S. at 134, 119 S.Ct. at 1899; *Wisdom v. State,* 1996 OK CR 22, ¶ 29, 918 P.2d 384, 393. Hanson's statements to Barnes were not admissible under either of these exceptions.

■ ¶ 36 Alternatively, the State submits the trial court properly admitted Hanson's statements to Barnes after finding Hanson's "comments regarding petitioner's guilt were so reliable that there was no need to subject them to adversarial testifying in a trial setting." At the hearing on the Motion in Limine, the trial court stated it looked at the following factors in reaching its determination: "spontaneity and consistent repetition, mental state of the declarant, lack of motive to fabricate, personal knowledge, time, relevance, [and] the custodial or noncustodial setting." The trial court said it had read "all of the statements of Rashad Barnes," and determined Hanson's statements were made of his own volition; Hanson inculpated himself as well as Appellant; his statements "did not shift blame, but rather acknowledged responsibility for those criminal acts attributed to Hanson and described those alleged criminal acts attributed to ... Mr. Miller"; and Hanson revealed this information to a friend.

¶ 37 We independently review the State's proffered guarantees of trustworthiness to determine whether they satisfy the demands of the Confrontation Clause. *See Lilly,* 527 U.S. at 137, 119 S.Ct. at 1900. We do not agree with the trial court's determination

14. Since *Lilly* was decided, and after Appellant was tried, 12 O.S.2001, § 2804(B)(3) has been amended to include the following language: "A statement or confession offered against the accused in a criminal case, made by a codefendant or other individual implicating both the codefen-

dant or other individual and the accused, *is not within this exception."* (emphasis added) 22 O.S.Supp.2002, § 2804. We note this amendatory language would have *specifically excluded* Hanson's statements to Rashad Barnes.

that admission of Hanson's statements did not violate Appellant's right of confrontation.

¶ 38 The trial court stated it read all of *Rashad Barnes* statements and testimony and noted his consistent repetition. We believe this "consistent repetition" is a factor more worthy of consideration when the hearsay is made by a child declarant in a child sexual abuse case. *See e.g. Idaho v. Wright,* 497 U.S. at 821, 110 S.Ct. at 3150. It is not the witness testifying to the declarant's statements whose consistent repetition is important; it is the consistent repetition of the same statements by the declarant. That *Rashad Barnes* testified on more than one occasion and spoke with police officers on more than one occasion does not make *Hanson's statements* to Barnes on a single occasion more reliable because Barnes consistently repeated them.

¶ 39 We note that every time Barnes spoke of his conversation with ·Hanson, his statements or testimony about what Hanson said became more detailed. Is a statement consistent when it is more or less detailed? Cross-examination of Hanson was crucial to test the accuracy and reliability of what Barnes said Hanson said.

¶ 40 The trial court noted the "mental state" of the declarant—that Hanson voluntarily approached Barnes and engaged "in an oratory of sort, recounting events leading up to his unannounced visit to the home of a friend." Barnes said Hanson came to his home in early September 1999, around 3:30 or 4:00 p.m., acting nervously and said, "It went all bad." Barnes said Hanson said "he had to kill somebody." Barnes of course had already heard on the street that his "homey" had killed somebody. Perhaps the trial court interpreted Barnes' testimony that Hanson was "acting nervously" as reflecting on Hanson's "then existing" mental state and interpreted his comments to Barnes as excited utterances.

¶ 41 Affording weight to Hanson's nervousness is not supported by the record where Barnes' testimony concerning the time and place of the conversation is inconsistent with the State's theory that the murders occurred on August 31st, 1999, between 4:00 and 6:00 p.m. The conversation could not have happened immediately following the carjacking and murders as Barnes implied it did. Any alleged nervousness Barnes said Hanson showed cannot be attributed to the stress or excitement of an event immediately preceding the conversation. *See* 12 O.S.2001, § 2803(1) and (2).

¶ 42 The trial court also said it considered Hanson's "personal knowledge" of the events. This factor is really not helpful. A codefendant's knowledge of the events only suggests the codefendant was there; it does not make his statement implicating someone else more. According to Barnes, Hanson said Appellant drove Bowles' car after the carjacking and Hanson remained in the back seat at all times with Bowles. This detail is not consistent with the forensic evidence recovered by the State from Bowles' car— specifically Appellant's fingerprint found on the passenger side safety buckle and Hanson's print on the driver's side buckle. This detail is the type of information defense counsel could have explored had Hanson been available for cross-examination.

¶ 43 Another factor the trial court considered was that Hanson's statements to Barnes "inculpated himself" and Appellant "and did not shift blame, but rather acknowledged responsibility for those criminal acts attributed to Hanson and described those alleged criminal acts attributed to ... Mr. Miller." This was the State's pretrial argument to the trial court. However, during closing argument, the prosecutor argued that Hanson "was mitigating his statement" as he told Barnes they initially intended to let Bowles go.[15] Whether Hanson shifted blame to Ap-

---

15. In Proposition Three, Appellant claims the State's change in theory of the case during closing argument denied him his right to a fundamentally fair trial. During the State's second first stage closing argument, the prosecutor argued (1) Appellant and Hanson carjacked Bowles and drove her "to the middle of nowhere, because they had to get rid of her;" (2) Appellant already planned to kill Bowles when he killed Thurman; and (3) Hanson "mitigated" his statement to Barnes when he said they were just going to "take her into the middle of nowhere and let her go." Prior to closing argument, the State's entire theory of its case was based upon the "inherent reliability" of Hanson's confession to Rashad Barnes and Barnes' testimony about

pellant, or mitigated his involvement, is a matter of perspective—certainly from a defense perspective, Hanson's statement that he only killed Bowles *after* Appellant told him "he knew what he had to do" shifts responsibility, through encouragement and pressure to kill, to Appellant and attempts to minimize Hanson's involvement.

¶ 44 By the time of closing argument, the State had changed its position that Hanson's statement was mitigating. This type of inculpatory confession which shifts responsibility to a codefendant is exactly the type of admission of a non-testifying accomplice's confession which the Supreme Court has held "plainly denied the right of cross-examination secured by the Confrontation Clause." *See e.g., Douglas v. Alabama*, 380 U.S. 415, 419, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); *Lilly*, 527 U.S. at 131–132, 119 S.Ct. at 1897; *see also McElmurry v. State*, 2002 OK CR 40, ¶ 43, 60 P.3d 4, 20 (Non-testifying co-defendant wife's statement inculpating herself and husband/defendant would have been inadmissible hearsay; "[i]t was just as likely that Vickie McElmurry was exaggerating her own

involvement to help her husband as it was the other way around").

■ ¶ 45 Just because a person makes "a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts." *Lilly*, 527 U.S. at 139, 119 S.Ct. at 1901 (*citing Williamson v. United States*, 512 U.S. 594, 599, 114 S.Ct. 2431, 2435, 129 L.Ed.2d 476 (1994)). "[O]ne of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature." *Williamson*, 512 U.S. at 600, 114 S.Ct. at 2435. Simply that Hanson voluntarily made a statement to a friend which exposed himself to criminal liability does not make his statement inherently trustworthy and reliable or obviate the need and value of thorough cross-examination.[16]

¶ 46 As in *Lilly*, neither the words Hanson allegedly spoke nor the setting in which he made them provides a sufficient basis for concluding his comments concerning Appellant's guilt were so reliable that there was no need to subject them to adversarial testing in a trial setting. While Hanson was not in a

---

what Hanson said. Citing *Patterson v. State*, 2002 OK CR 18, 45 P.3d 925, Appellant claims the prosecutor's change in theory—that the murder of Bowles was planned from the beginning—substantially violated his rights because the prosecutor misled the defendant and trial court with the original theory to get Hanson's statement to Barnes admitted into evidence; the admission of this out-of-court statement denied Appellant his right of confrontation, and Appellant was not prepared to defend against the change in theory.

While we are not persuaded by Appellant's claim that the prosecutor's change in theory—that there was an intent "to get rid of" Bowles from the beginning—deprived him of proper notice of what he had to defend against and asked the jury to reject the essence of Hanson's confession, we are bothered the State's admission to the jury that Hanson's statements to Barnes were, at least, mitigating. During pretrial argument relating to the admissibility of Hanson's confession to Barnes, the State certainly did not argue or did not admit the confession was in any way unreliable, mitigating or blame-shifting. As stated previously, Barnes testimony about Hanson's confession should not have been admitted. The trial court might have ruled differently had the State admitted prior to trial that Hanson's confession to Barnes was been "mitigating" or not completely believable. Because we grant relief on other grounds, we need not comment further on this claim.

16. The State urges this Court to find Hanson's statements were inherently reliable because they were made to a friend, rather than a police officer, and were against his penal interest. The State relies on *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). *Dutton* was a conspiracy case and there a co-conspirator said to his cellmate upon his return from court, "[I]f it hadn't been for that dirty son of a bitch Alex Evans, we wouldn't be in this now." 400 U.S. at 77, 91 S.Ct. at 214. The court found no confrontation problem, noting the hearsay was peripheral, and was not devastating or crucial evidence and the evidence was admissible under the co-conspirator exception to the hearsay rule. *Id.*, 400 U.S. at 88, 91 S.Ct. at 219. We also distinguish this case from those cited by the State which involved non blame shifting or non mitigating statements to family members or friends. *See United States v. Boone*, 229 F.3d 1231 (9th Cir.2000)(inculpatory non mitigating/non blame shifting statement to girlfriend); *Denny v. Gudmanson*, 252 F.3d 896 (7th Cir.2001)(non-blame shifting statements to trusted friends and relatives); *United States v. Shea*, 211 F.3d 658 (1st Cir.2000)(non-blame shifting statements to friends not affected by *Lilly*); *United States v. Tocco*, 200 F.3d 401 (6th Cir.2000)(non-blame shifting statement to son); *State v. Toney*, 131 N.M. 558, 40 P.3d 1002 (2002)(critical distinction between statement to friend and to police officer).

custodial setting as the declarant was in *Lilly*, this single factor does not mandate a finding that his statement to Barnes was so inherently reliable that cross-examination would have been superfluous. If Barnes testified truthfully, Hanson inculpated himself and mitigated his own involvement to place responsibility for the murders on Appellant. Barnes was not shown to be a close and trusted friend; Barnes was shown to be a street-wise acquaintance who allowed Hanson to live in a car parked in his parent's yard.

¶ 47 Hanson's confession to Barnes was the most critical evidence in the State's case. It not only was the only evidence directly connecting Appellant with the carjacking and subsequent murders, it was also the only evidence implicating Appellant as the controller of the events, the decision maker, and the evidence which placed responsibility for the incidents beyond the carjacking upon Appellant. From the record before us, we cannot conclude that Hanson's statement to Barnes was so inherently reliable that cross-examination would have been superfluous. Under the facts presented here, we find the admission into evidence of Hanson's statement to Barnes violated Appellant's Sixth Amendment right to confrontation.

■ ¶ 48 Because this error is of constitutional magnitude, Appellant's conviction cannot stand unless we find that the error was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710–711 (1967). Without the admission of Hanson's statements to Barnes implicating Appellant, the evidence in this case connecting Appellant to the murders of Bowles and Thurman consisted of a single fingerprint found in Bowles' car, a ballistics match from a bullet recovered from Thurman to a gun found in Appellant *and* Hanson's possession after a robbery, and Appellant's act of "wiping down" Bowles' car some time after the murder. We cannot say, beyond a reasonable doubt, that admission of Hanson's untested statement through the testimony of Rashad Barnes did not affect the jury's determination of guilt. Accordingly, this error requires this case to be reversed and remanded for a new trial.[17]

■ ¶ 49 In a related claim of error, Appellant argues the trial court's "erroneous evidentiary ruling limiting the scope of Miller's cross-examination" of Barnes deprived Appellant of his Fifth, Sixth and Fourteenth Amendment rights. Sometime after Barnes testified before a grand jury, officers picked him up at his home to bring him in for further questioning. The State objected on hearsay grounds when defense counsel asked Barnes, "[t]hey called you a liar while you were in that car, didn't they?" The trial court sustained the objection. Appellant complains the trial court should have allowed defense counsel to elicit from Barnes that the officers called him a liar, not to prove the truth of the matter asserted, but rather to show the effect the statement had on Barnes' subsequent statement to Detective Nance upon Barnes' arrival at the police station. We agree.

¶ 50 A statement which is not offered for the truth of the matter asserted is not hearsay. 12 O.S.2001, § 2801(A)(3); *Chambers v. State*, 1982 OK CR 123, ¶ 16, 649 P.2d 795, 798, *overruled on other grounds in Richardson v. State*, 1992 OK CR 76, ¶ 7, 841 P.2d 603, 605. What the officers said to Barnes moments before he gave another more detailed statement about what Hanson told him was relevant, admissible evidence, because it was not offered for the truth of the matter asserted, but to show why Barnes provided additional information to Detective Nance which he had not disclosed earlier. This type of evidence is routinely and properly admitted when an out of court statement is not offered to prove the truth of the matter asserted. *See e.g., Williams v. State*, 2001 OK CR 9, ¶ 64, 22 P.3d 702, 719, *cert. denied*, 534 U.S. 1092, 122 S.Ct. 836, 151 L.Ed.2d 716 (2002)(statement daughter delivered food to the homeless not offered for truth of the matter, but to show characteristics of victim); *Powell v. State*, 2000 OK CR 5, ¶ 97, 995 P.2d 510, 532, *cert. denied*, 531 U.S. 935, 121 S.Ct. 321, 148 L.Ed.2d 258 (2000)(officer's communication with homicide division not offered

---

17. On retrial, we note the amended 12 O.S.Supp. 2003, 2804(B)(3) applies to this case.

for truth but to show why officer began to search defendant); *Patton v. State*, 1998 OK CR 66, ¶ , 973 P.2d 270, *cert. denied*, 528 U.S. 939, 120 S.Ct. 347, 145 L.Ed.2d 271 (1999)(witness' statement that police told them there was another suspect was not offered for truth but to show reason for witness' concern for father); *Woodruff v. State*, 1993 OK CR 7, ¶¶ 56–59, 846 P.2d 1124, 1139, *cert. denied*, 510 U.S. 934, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993)(witness testimony of conversation he had with codefendant that it was common knowledge around pool hall victim was murdered on Saturday and body discovered on Monday or Tuesday was admissible to show people in pool hall had talked about death and was not offered for the truth).

■■■ ¶ 51 The scope and method of cross-examination are within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *Miller v. State*, 1998 OK CR 59, ¶ 46, 977 P.2d 1099, 1110, *cert. denied*, 528 U.S. 897, 120 S.Ct. 228, 145 L.Ed.2d 192 (1999). Here, Barnes' motivation for revealing his conversation with Hanson, his motivation for providing another more detailed statement to Detective Nance, and his credibility were all relevant and vital to Appellant's defense, particularly when the defense was prohibited from cross-examining Hanson about his statements. Trial counsel should have been allowed to question Barnes about the effect the officers calling him a liar had on his subsequent statement to Detective Nance.

[12] ¶ 52 The trial court should have allowed this line of inquiry. Its ruling sustaining the State's hearsay objection was error, which compounded the error identified in Proposition One and further violated Appellant's right to confront the witnesses against him. This constitutionally improper denial of a defendant's opportunity to impeach or question a witness' motivation to lie, like other Confrontation Clause errors, is subject to a harmless error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674, 686–687 (1986). In conjunction with the error identified in Proposition One, we cannot find this error harmless beyond a reasonable doubt.

¶ 53 In light of the errors identified above, affecting both the first and second stages of trial, we find this case must be, and hereby is, ***REVERSED AND REMANDED FOR A NEW TRIAL.*** The remaining propositions of error need not be addressed.

CHAPEL and STRUBHAR, JJ., concur.

LUMPKIN, J., concurs in result.

LILE, V.P.J., dissent.

LUMPKIN, J., Concurring in Result.

¶ 1 I concur in the result reached in this opinion and agree that this case presents a statutory violation that touches upon Appellant's Confrontation Clause rights and requires reversal. However, I cannot agree with some of the analysis used and write to point out a more important constitutional basis that prohibits admission of a non-testifying co-defendant's statement under the circumstances presented.

¶ 2 While significant amendments were made to 12 O.S.2001, § 2804(B) in 2002 (did not go into effect until November 1, 2002), I find the reasoning behind the amendments to that statute still apply. In other words, the "nontestimonial" statement made by Appellant's co-defendant Hanson to Rashad Barnes should not have been admitted in Appellant's trial under the former version of the statute, 12 O.S.Supp.1991, § 2804(B)(3), for the statement was simply not trustworthy. The statement was, therefore, classic hearsay without an applicable exception.

¶ 3 The Opinion spends a lot of time analyzing and quoting from the United States Supreme Court's recent opinion in *Lilly v. Virginia*, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999). But *Lilly* was a plurality opinion and most of the quotes taken from *Lilly* did not even receive a majority of the votes. We should refrain from relying too heavily on plurality views. For our purpose here, the most that should be said of *Lilly* is that six justices found "the admission of the untested confession of Mark Lilly violated Petitioner's Confrontation Clause rights" as per Part VI of the Opinion. Indeed, the Court did not even foreclose the possibility

that such error could be found harmless beyond a reasonable doubt.

¶ 4 Furthermore, *Crawford v.Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) is, in my opinion, a red herring, for it is clearly distinguishable from the situation here. *Crawford* dealt with "testimonial" hearsay made to the police by the defendant's wife, who never testified against her husband because of a state marital privilege. The instant case involves non-testimonial hearsay of a co-defendant, which was overheard by a third party who then testified in Appellant's trial. Since *Crawford* did not deal with the issue of how "non-testimonial" hearsay should be treated, we should not, in turn, be "reading" the case "to allow the admission of such anon-testimonial statement over the defendant's right of confrontation if the hearsay is inherently trustworthy and reliable," especially when the hearsay involved here was neither.

¶ 5 All that being said, the more important issue, overlooked in the Court's opinion, is the strict prohibition against the use of statements/confessions of a non-testifying co-defendant set forth in *Bruton v. United States,* 391 U.S. 123, 127–28, 88 S.Ct. 1620, 1623, 20 L.Ed.2d 476 (1968) (finding admission of anon-testifying co-defendant's confession in Appellant's joint trial violated Appellant's constitutional right of confrontation) and *Cruz v. New York,* 481 U.S. 186, 191, 107 S.Ct. 1714, 1717, 95 L.Ed.2d 162 (1987) (finding pretrial confession of one defendant is not admissible against co-defendants, unless the confessing defendant waives his Fifth Amendment right, so as to permit cross-examination).

¶ 6 What cannot be done directly under *Bruton* or *Cruz* certainly may not be done indirectly through a straw man, such as Barnes in this case. Moreover, even prior to *Crawford,* Barnes's testimony could not have passed the reliability test due to the lack of independent evidence to corroborate his testimony.